UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald David BUCK, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Harold SMITH, Defendant-
Appellant.

Nos. 562–70, 563–70.

United States Court of Appeals,
Tenth Circuit.

Sept. 21, 1971.

James F. Housley, Asst. U. S. Atty. (C. Nelson Day, U. S. Atty., on the brief), for plaintiff-appellee.

Edwin B. Fieman, Denver, Colo., for Donald David Buck.

Russ W. Bond, Denver, Colo., for Charles Harold Smith.

Before PHILLIPS, HILL and HOLLOWAY, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

On February 18, 1970, a complaint was filed by a Special Agent of the Federal Bureau of Investigation, hereinafter referred to as the F.B.I., with the United States Commissioner for the District of Utah, charging Smith and Buck jointly with burglary of the First Security Bank of Utah, N.A., Park City Branch,[1] the deposits of which were insured by the Federal Deposit Insurance Corporation. On the same day they were taken before such Commissioner, were advised of their rights, and counsel was appointed to represent them.

On March 4, 1970, each of them waived a preliminary hearing and was bound over to the United States District Court for the District of Utah, Central Division.

On March 17, 1970, both waived indictment by a grand jury, and consented to be and were charged by information.

A two-count information was filed charging them jointly with violation of 18 U.S.C. § 2113(a) and § 2113(b).

· The first count charged that "[o]n or about February 13, 1970, at Park City in the Central Division of the District of Utah" they entered the Bank, "the deposits of which were then and are now insured by the Federal Deposit Insurance Corporation, with intent to commit" a felony therein, in violation of 18 U.S.C. § 2113(a).

The second count charged that at the same time and place they "did unlawfully take and carry away, with intent to steal and purloin" from the Bank, "the deposits of which were then and are now insured by the Federal Deposit Insurance Corporation, money belonging to and in possession of" the Bank "exceeding $100.00 in value, to wit, $3,890.00" in violation of 18 U.S.C. § 2113(b).

On June 23, 1970, they each entered pleas of not guilty.

On July 13, 1970, on motion of the United States, a severance was granted and it was ordered that the defendants be tried separately.

Buck was tried on July 30, 1970, and was found guilty on both counts. From a judgment of conviction and sentence he has appealed. The trial of Smith was begun on July 31, 1970, and on August 3, 1970, a verdict was returned finding him guilty on both counts. From

1. Hereinafter referred to as the Bank.

a judgment of conviction and sentence Smith has appealed.

The appeals were consolidated for hearing in this court. However, we will first consider and decide the Buck case, because the evidence in the two cases is quite different.

### No. 562–70

### The Buck Appeal

The following facts were established by the evidence in the Buck case and are not disputed, except as explained in note 2 hereto.[2]

On the night of February 13, 1970, William Edward Mawhinney, Jr., owned and operated an automobile sales and service garage housed in a cinder block, exterior stucco-plastered building in Park City, Utah. On that day he was the last one to leave his place of business. He left about 7:45 p. m. Just before leaving, he checked all the doors and windows and found they were all closed and locked. When he returned to his garage the next morning, he discovered that the building had been broken into, and his oxygen tank, acetylene tank, and the cutting torches to be used therewith had been taken. Such equipment, consisting of the two tanks, rubber hoses connecting them, and cutting torches had been marked as Plaintiff's Exhibits 3, 4, and 5, and Mawhinney examined them and testified they were his tanks, hoses, and cutting torches, which had been taken from his garage. He also testified that a leather jacket belonging to his son, William Edward Mawhinney, III, was hanging up in the garage when he left, that he had not seen it since, and that his son worked for him at the garage.

During February 1970, Miles T. Ivers was a real estate salesman for the Gardner Realty Company in Park City, Utah. The building in which the realty office was located and the Bank building were adjacent to each other. While they were separated by two walls, one owned by the Bank and the other owned by the Realty Company, the walls were constructed so they abutted against each other. When Ivers arrived at his office the morning of February 14, 1970, he took out his office key to unlock the door and discovered it was unlocked. He entered and further discovered immediately in front of the door a piece of corrugated tin and around it pieces of ice, shaped like icicles. He went into the room that adjoined the Bank building and saw that the light was on. He discovered a hole through the two walls, extending from a stairway in the realty building into the Bank building. He saw some footprints in the dust beneath the hole. He went back to some people with whom he had an appointment and who had come to meet him and told them to stay out of the room where the hole was and not to disturb anything. He then reported what he had discovered to the city marshal. He said the hole and debris were not there the preceding day.

Mrs. Donna Wright Dearden was the Manager of the Bank. The deposits of the Bank were insured by the Federal Deposit Insurance Corporation on February 13, 1970, and at the time the indictment was returned.

Mrs. Dearden worked in the Bank on February 13, 1970. She left the Bank about 6:35 p. m. that day. Before leaving, following her regular procedure, she made sure the vault time lock was set and that the windows and doors were

---

2. When the Government rested at the conclusion of its case in chief, Buck also rested without testifying himself or offering any evidence in his own behalf.

However, during the trial objection was made by counsel for Buck to the introduction of a confession made by Buck to F.B.I. Agent Shepherd and certain statements made by Buck to F.B.I. Agent Sacia. Whereupon, the court recessed the trial and held an evidentiary hearing on the issues raised by counsel for Buck that such confession and statements were induced by promises made to Buck by Shepherd, and by N. D. Hayward, Captain of Detectives in the Salt Lake County Sheriff's Office. Buck did testify at such hearing and there were disputes in the evidence introduced at such hearing.

closed and locked. She returned to the Bank about 10 a. m. on Saturday, February 14, 1970, together with a highway patrolman. They discovered that the Bank had been entered during the previous night through a hole in the wall between the Bank and the adjoining realty office. She noticed there were oxygen and acetylene tanks on the floor, that there was a hole in the vault, and some burn marks on the floor. Such tanks, hole in the walls, and burn marks were not present when she closed and left the Bank about 6:35 p. m. the previous day.

The vault door was opened the afternoon of February 14, 1970, and an audit disclosed that $3,933 in half dollars, quarters and small coins was missing.

James G. Sacia, a Special Agent of the F.B.I., went to the Bank about 11 a. m. on February 14, 1970. He observed a hole about 20 by 24 inches through the south wall of the realty office and the north wall of the Bank and another hole in the vault wall about 9 by 14 inches, which had been cut with an acetylene torch, and on the floor an acetylene tank and an oxygen tank, connected with hoses to cutting equipment. He also noticed that the hot torch had been applied to the safe. He also observed that two large bolts had been removed from a hinge in the vault door, and that the vault door was partially pried open and held open by pieces of metal which enlarged the hole cut in the vault wall. He observed broken-up mortar, dust, and other soft material on a desk immediately below the hole in the wall, on a rubber mat immediately

south of the vault door, and on a window sill. The walls of the two buildings were made of brick and mortar.

Using the same method and material used to lift fingerprints, he endeavored to lift impressions of footwear prints from the crumbled mortar, dust, and other soft material on top of the desk, on a chair, on the window sills and on the floor. Some of them were partially successful and marked as exhibits. One, especially, marked Plaintiff's Exhibit 11, was good enough to make a comparison with the sole of a boot.

Directly below the hole in the vault, there was a dried red substance that looked like blood.

N. D. Hayward was a Captain in the Detective Division of the Salt Lake County Sheriff's Office. He was acquainted with Buck. He had a conversation with Buck on February 17, 1970. He talked to Buck about the burglary of the Bank and advised him of a piece of evidence that had been picked up in Buck's automobile, the leather jacket referred to above, which belonged to Mawhinney's son, and asked Buck if he would like to talk to Charles J. Shepherd of the F.B.I. Buck agreed to talk to him. Hayward then had Shepherd come in and he introduced Buck to Shepherd. Shepherd showed Buck his credentials, including his name and picture. He then told Buck before he talked with him about the Bank burglary he wanted to explain to him his rights, and furnished Buck with the regular F.B.I. explanation of rights and waiver form, which Buck signed, and which is set out in note 3 hereto.[3]

---

3. The F.B.I. form read:

"YOUR RIGHTS

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"Do you fully understand what you have just been told?

"WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. I am willing to make this statement and

At this point, we digress from the statement of facts shown by the testimony of Shepherd and turn to additional facts shown by the testimony of Sacia, in order to show the grounds set forth in the objection of counsel for Buck to the admission of testimony of Shepherd respecting a confession made by Buck to Shepherd and the testimony of Sacia respecting incriminating statements made by Buck to Sacia.

Counsel for the United States handed Sacia an exhibit marked Plaintiff's Exhibit 12, which was a pair of boots, and asked him to examine them and state whether he had seen them before. Sacia said that he had seen them; that he had first seen them at an address, 2802½ West 3500 South in Granger, Utah; that at that time there were present with him Buck and Deputy Sheriff Ned Frandson. Sacia then identified Buck in the courtroom. Counsel for the United States then asked:

"At the time you saw those boots did you have any conversation with any of the persons present with respect to who owned those boots?"

Sacia replied, "Yes sir, with Donald Buck." He was then asked, "What was said and by whom in that conversation?"

Thereupon, counsel for Buck objected to the evidence of such conversation. The jury was excused and Gerald E. Nielsen, counsel for Buck, stated:

"Your Honor, we claim essentially that this conversation, together with conversations had with the defendant in the jail, were induced by representations of FBI agents and sheriff's deputies that, if the defendant did make admissions or confessions, certain charges brought against him in the state courts would be dropped."

Counsel for Buck had not, prior to the trial nor at the beginning of the trial, made any motion to suppress the statements that Buck made to Shepherd and Hayward, nor to suppress the conversa-

tion between Sacia and Buck with respect to the boots, and he did not contend that before such statements were made by Buck to the F.B.I. Agents and sheriff's deputies that his rights had not been fully explained to him and that he had not been shown the F.B.I. form of explanation of rights and waiver of rights, or there had been any unlawful search and seizure of the boots, but rested his contentions solely on the objection he had made, namely, that the statements and conversations were induced by representations of F.B.I. Agents and sheriff's deputies that if Buck would make admissions or confessions certain charges brought against him in the state courts would be dropped. He also objected to the introduction of the boots solely on the same ground.

At the point when the above objection was made by counsel for Buck, the court recessed the trial, sent the jury out, and held an evidentiary hearing with respect to the contentions made by Buck's counsel.

At such hearing by the court, Buck testified that before he gave any statement to F.B.I. Agent Shepherd, he had conversations with both Shepherd and Hayward; that he talked with Hayward first and Hayward told him that the F.B.I. had a leather jacket they found in Buck's automobile and they were going to file a complaint against him for bank burglary; that Hayward asked him if he "wanted to say anything about this"; that he then asked Hayward, "if I was to say anything about this, if the state charges would be dropped, at which time he told me that they would be"; that Hayward then went and got Shepherd; that Shepherd handed him a piece of paper and asked him to sign it; that before he signed it he asked Shepherd "if he thought the state would drop their charges"; that "[h]e said they would drop their charges, and he referred to another case where they had done such a thing"; that after that conversation

answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or

threats have been made to me and no pressure or coercion of any kind has been used against me."

he made a statement to Shepherd and accompanied the officers to his home and they obtained the boots.

On cross-examination, Buck testified that what he signed was the Miranda warning, showing he was not unsophisticated as to his rights; that Hayward was in the room during his conversation with Shepherd, and that Hayward repeated in Shepherd's presence "that the state charges would be dropped if I was to cooperate with the federal, with Mr. Shepherd."

On cross-examination, Buck was asked what Shepherd said with respect to the dropping of the state cases. Buck replied that Shepherd said: "It was his knowledge, or his—under his knowledge, that he had seen it done where the cases had been dismissed in state courts." He was then asked, "What you are saying is he said he had seen it before happen that way?" Buck answered, "Yes, he said that, I am pretty sure." Buck was then asked, "Did he say he would do it in this case?" Buck answered, "He said he would do everything he could to help me. Yes."

At such hearing, Hayward testified that he had talked to Buck and referred to the burglary of the Park City Bank, but that "I didn't know enough about the burglary to question him"; that he advised Buck of a piece of evidence that had been picked up in his automobile and asked Buck if he would like to talk to Agent Shepherd; that Buck agreed to talk to Agent Shepherd, and that "I went down and had Agent Shepherd come in."

Hayward said he did not recall any conversation between him and Buck about state charges before Buck made his statement to Shepherd. He further testified that on several occasions, after Buck had given his statement to Shepherd, Buck asked him what usually happens to state charges when a man pleads guilty or is found guilty on a federal charge, and that he told Buck in some cases the state does relinquish its rights to the Federal Government, but that he had no authority to promise that would happen.

Hayward further testified that he did not tell Buck in his conversation with him before Shepherd arrived that any pending state charges against him would be dismissed if he cooperated with the federal authorities, nor tell him anything that could be so construed; that he took Shepherd into the room, introduced Buck to Shepherd, and said nothing after that during the conversation between Shepherd and Buck, and that he did not hear any discussion about state cases until Buck's statement to Shepherd was fully completed.

Shepherd testified at such hearing that on February 17, 1970, he had a conversation with Buck at the Salt Lake County Jail in the interview room on the second floor; that Hayward was present during such conversation; that he walked into the room and Hayward introduced him to Buck; that he showed Buck his credentials, which included his name and picture; that he advised Buck that before any talking was had about the burglary of the Bank, he wanted to explain to Buck his rights; that he handed him Plaintiff's Exhibit 13; that Buck read it, and he then asked Buck if he understood it; that Buck answered, "Yes"; that he then asked Buck if he was willing to sign a waiver and Buck said, "Yes" and then signed the waiver, which was witnessed by Hayward's and Shepherd's signatures. Exhibit 13 was then offered in evidence and counsel for Buck stated he had no objection thereto.

Shepherd further testified at such hearing that he then asked Buck about the burglary of the Bank, and that Buck made a complete statement to him with respect thereto; that prior to the completion of his inquiry and Buck's statement to him, he had no conversation whatever with Buck about the dropping of state charges; that Hayward took no part in the questioning of Buck; that all Hayward said was to introduce him to Buck; that after the interview and Buck's statement were fully completed,

Buck asked him what the penalty was for bank burglary and he told him; that Buck then mentioned the fact that there were some state charges pending against him and asked Shepherd what was the procedure, whether the state or United States "had first chance in a trial"; that he told Buck, "that is up to the court; I have no decision there"; that he further told Buck, "I had nothing I could offer as far as local cases; that is a separate branch; I have nothing to do with it."

At the close of such hearing, the court found that neither Shepherd nor Hayward made any promises to Buck with respect to the dropping of state cases or otherwise, and that a full explanation was given by Shepherd to Buck of his rights; that Buck understood his rights, as set forth in the written Miranda warning which was read to him and given to him, and that he intelligently and voluntarily made such confession to Shepherd and statement to F.B.I. Agent Sacia with respect to the boots, and overruled the motion. The trial was then resumed, and the jury was recalled.

Shepherd again took the stand and testified that after Buck had been fully informed of his rights, he said that he and Charles Smith went over in the afternoon of February 13 in Buck's white 1967 Ford to Park City and looked over the Bank; that later that night they returned and went through the back of a building adjacent to the Bank and then made a hole through the wall by chiseling through the mortar and the bricks; that after making such hole they went down to the Mawhinney garage and obtained two tanks, one of oxygen, one of acetylene, the hoses, and two torches; that they came back to the building adjacent to the Bank, opened the door, and carried the tanks and other equipment through the building and put them through the hole in the wall into the Bank; that they took turns cutting on the vault door with such cutting equipment; that they did not gain entrance into the vault until about 7 a. m. on February 14, 1970; that after they completed an entrance into the vault it was discovered that Buck was unable to enter because his shoulders were too wide, and the entrance into the vault was actually made by Smith, who handed out to Buck coins consisting of half dollars, quarters, and nickels; that the currency was in a round safe in the vault; that they removed the coins from the Bank; that the amount was about $3,000; that they moved the coins through the hole into the adjoining building, put them into a barrel, placed it on a piece of tin that had a rope attached to it, and went out the door of the adjoining building to the street; that they saw a man coming down the street, placed the barrel close to the building just south of the Bank, and went to get Buck's car, the 1967 Ford, which was parked about three blocks away; that they then returned to where the barrel was; took the money out of the barrel, put it in Buck's car, put the barrel and the tin back inside the building, and proceeded to Salt Lake City. Buck further said that the last time he saw the money was on the following afternoon on a bed where he and Smith were counting it, and that Smith undertook to make disposition of the coins.

Shepherd further testified that Buck refused to make a signed statement, and that he made full notes of Buck's statement and incorporated them in a report.

Sacia was then recalled as a witness. He was handed a pair of boots marked for identification as Plaintiff's Exhibit 12. He testified that he "went out there to obtain those boots"; that he, a deputy sheriff, and Buck entered the house and he asked Buck for the boots; that Buck reached into a closet, picked up the boots and handed them to him; that he asked Buck, "Are these the boots that were used in the burglary?" and Buck answered, "Yes, they are." Sacia further testified that when he returned to the F.B.I. office, he compared the soles of the boots with the print lift in Exhibit 11, using a magnifying glass, and concluded that the print lift shown in Exhibit 11 was made by a boot sole sim-

ilar to the sole of Exhibit 12, Buck's boots.

Counsel for Buck did not in anywise contend that Buck was not fully apprised of his rights and properly warned by Shepherd before he signed the waiver of rights and made the confession statement to Shepherd.

The record is silent as to whether Hayward warned Buck of his rights, but Hayward did not ask Buck any incriminating questions, nor did Buck give him any incriminating answers.

As we have heretofore shown, the sole question presented with respect to the admission of Buck's confession, made to Shepherd, and Buck's statements, made to Sacia with respect to the boots, is whether they were induced by promises made by Shepherd and Hayward to Buck. The court had an opportunity at the hearing held to determine that issue to observe the witnesses while testifying and their demeanor on the witness stand, and was in a much more advantageous position than we are to determine their credibility and the weight to be given their testimony.

The court, in passing on the issues presented at the hearing accorded Buck by the court on the admissibility of the confession made to Shepherd and the statements made to Sacia by Buck, observed that Buck while testifying was "weak, not affirmative"; that he was "hesitant"; that his memory was "uncertain" and that he made conflicting statements. Discrepancies between Buck's testimony on direct and on cross-examination fully justified the trial court's observation.

On the other hand, the record clearly shows that the testimony of Shepherd and Hayward was forthright, direct, and unequivocal. Moreover, their evidence is corroborated by the statements in the Waiver of Rights, set out, supra, in note 3 and signed by Buck, which he testified he understood.

We conclude that the court correctly decided the issues raised at such hearing and that the confession and statements were intelligently, understandingly, and voluntarily given, and were not in anywise induced by promises or statements made by either Hayward or Shepherd.

Counsel for Buck contends that Hayward did not give Buck the Miranda warning, and therefore the questions asked him by Hayward and answered by Buck violated Buck's Fifth Amendment rights against self-incrimination, but it is clear from Buck's testimony as well as Hayward's testimony, that Hayward asked Buck no questions, the answers to which would incriminate Buck, and that Buck made no incriminating statements to Hayward.[4]

Buck further contends that Sacia recovered possession of the boots by an unlawful seizure, in violation of the Fourth Amendment.

Buck objected to the introduction of the conversation between Sacia and himself at the time Buck obtained the boots from a closet in Smith's house and turned them over to Sacia, and to the admission of the boots, solely on the ground that Buck's statements and admissions with respect to the boots and his turning over of the boots to Sacia "were induced by representations of F.B.I. agents and sheriff's deputies that, if defendant did make admissions or confessions certain charges brought against him in the state courts would be dropped."

Buck at no time objected to the introduction of the boots on the ground that they were obtained by unlawful seizure, at the trial by a motion to suppress, or otherwise.

At the conclusion of the evidentiary hearing by the court on Buck's objection to the testimony and admissions made by Buck to Sacia and the admissions and confessions made by Buck to Shepherd, the court found that neither Hay-

ward nor Shepherd made any promises or representations to Buck that if he did make admissions or confessions, certain state charges brought against him in state courts would be dropped and that the admissions and confessions Buck made to Shepherd and the statements Buck made to Sacia were freely, intelligently, and voluntarily made by Buck.

We have already considered the holding of the trial court and held that its ruling was correct.

Viewing the evidence in that posture, it is entirely clear that Buck freely, voluntarily, and understandingly consented to give the boots and did give the boots to Sacia.

■ Since the right to be secure against unreasonable seizures may be waived by consent given freely, understandingly, and voluntarily, we conclude that the boots were not obtained by Sacia by an unlawful seizure in violation of Buck's rights under the Fourth Amendment.[5]

Buck further contends that his confession, made to Shepherd, was inadmissible because he was denied the protection of Rule 5(a) of the Federal Rules of Criminal Procedure. That contention was not interposed in any way by Buck in the trial court.

Buck was arrested by a Salt Lake County Deputy Sheriff on February 17, 1970, and held in custody in the County Jail. He gave the confession to Shepherd immediately after he signed the Waiver of Rights at 2:25 p.m. on February 17, 1970. There was no showing that the time between his arrest and the time he was questioned by Shepherd was greater than the six-hour period permitted by 18 U.S.C.A. § 3501(c).

Neither is there any showing that Buck, at the time he made the confession, was not being held by the state officers for a state offense, and there is an intimation in the record that he was so being held for a parole violation.

Had the objection been raised in the trial court, the Government might have been able to prove that the arrest of Buck was made by the state officials for a state offense, not for a federal offense; that at the time Buck gave the confession he was being held by the Utah authorities on a state charge, and that there was no unnecessary delay by the federal officers in taking Buck before a United States Commissioner after they took custody of him on a warrant issued by such Commissioner on a complaint charging him with the crimes for which he was tried.

Indeed, the record in the Smith case shows that Buck was being held in custody on a state charge at the time the confession was given; that he was not then being held by the state officials for the federal government, and that there was no unreasonable delay in taking Buck before a United States Commissioner after he was arrested on a federal warrant issued by such Commissioner. However, we cannot consider facts shown in the Smith record and not shown by the record in the Buck case.

■ Rule 5(a) of the Federal Rules of Criminal Procedure applies only to arrests made by or for a federal official for a violation of a federal law. It has no application to arrests made under state law for state offenses.[6]

■ We think it clear that the record in the Buck appeal wholly failed to show a violation of Rule 5(a) of the Federal Rules of Criminal Procedure.

■ Moreover, we are of the opinion that under the existing facts and circumstances we should not consider the

---

5. McDonald v. United States, 10 Cir., 307 F.2d 272, 274; Thomas v. United States, 10 Cir., 154 F.2d 365, 366.

6. Butterwood v. United States, 10 Cir., 365 F.2d 380, 384; Swift · v. United States, 10 Cir., 314 F.2d 860, 862; Chapman v. United States, 10 Cir., 397 F.2d 24, 26; Tucker v. United States, 8 Cir., 375 F.2d 363, 370.

objection raised by Buck for the first time on his appeal.

At the close of the Government's evidence in chief, when the Government rested, Buck also rested without introducing any evidence. In the trial court Buck did not challenge the sufficiency of the evidence to support verdicts of guilty against him, either by a motion for a directed verdict or otherwise, and he only obliquely raises that question at the conclusion of his brief in this court.

■ In passing on the sufficiency of the evidence to support a verdict of guilty in a criminal case, an appellate court will not weigh conflicting evidence nor consider the credibility of witnesses, and it must view the evidence and the reasonable inferences that may be drawn therefrom in the light most favorable to the prosecution and determine as a question of law whether there is substantial evidence, either direct or circumstantial, to support a verdict of guilty.[7]

■ We are of the opinion that Buck's confession to Shepherd, his statements and admissions to Sacia, the similarity of the soles of Buck's boots, which he wore on the night of the crime, to the lifts and photographs of the footwear prints found in the Bank and the adjoining building on the morning of February 14, 1970, and the facts and circumstances shown by the evidence, when considered in accordance with the rule above stated, afforded adequate support for the verdicts of guilty returned by the jury against Buck.

■ When a person commits the offense of burglary of a bank, as defined in 18 U.S.C. § 2113(a), paragraph two, and at the same time commits the offense of larceny from the same bank, as that offense is defined in 18 U.S.C. § 2113(b), the latter offense merges into the former offense. Accordingly, the conviction and sentence of 10 years on the second count in No. 562–70 should be and they are hereby vacated, and the conviction and sentence of 10 years on the first count in No. 562–70 are affirmed. See Schutz v. United States, 10 Cir., 432 F.2d 25, 29.

### No. 563–70

### The Smith Appeal

At the beginning of the Smith trial, counsel for the parties orally stipulated that Mrs. Donna Wright Dearden, if called as a witness, would testify that she was the Manager of the First Security Bank of Utah, N.A., Park City Branch,[8] the deposits of which were insured by the Federal Deposit Insurance Corporation; that Plaintiff's Exhibits 1 and 2 were the F.D.I.C. policies insuring such Bank; that she was on duty at the Bank on February 13, 1970; that it was about 6:30 p. m. that day when she and two other ladies closed the Bank, and that it was intact; that there were no holes in the wall and no holes in the vault door; that the vault door was closed and locked and the time lock was set; that there was currency and coin in the vault at the time it was closed and locked; that she returned to the Bank the next morning, February 14, 1970, at approximately 10 o'clock; that at that time she found dust, debris, and pieces of mortar all around the Bank; that she found a hole in the wall of the Bank and the adjoining wall of the Gardner Realty Company and also a hole in two doors of the vault; that she made an audit of the contents of the vault later, and the loss to the Bank was $3,933 in half dollars, quarters, dimes and nickels; and that she would further testify that she found three items, marked Plaintiff's Exhibits 3, 4, and 5, which were not in the Bank when it closed on February 13, 1970. Exhibits 3, 4,

7. Steiger v. United States, 10 Cir., 373 F. 2d 133, 135; Etheridge v. United States, 5 Cir., 380 F.2d 804, 809; Williamson v. United States, 5 Cir., 365 F.2d 12, 14; Feutralle v. United States, 5 Cir., 209 F. 2d 159, 161; Sykes v. United States, 5 Cir., 373 F.2d 607, 609; Gorman v. United States, 5 Cir., 323 F.2d 51, 52.

8. Hereinafter referred to as the Bank.

and 5 were the oxygen and acetylene tanks, connecting hoses, and cutting torches.

Counsel further stipulated that Miles T. Ivers, if called as a witness, would testify that he was a salesman for Gardner Realty Company of Park City, Utah; that the Realty Company was housed in a building adjoining the Bank; that he was on duty at the Realty Company on February 13, 1970; that at the time he left the office on the afternoon of that day, there were no holes in the walls of the Realty Company and the Bank; that he returned to the Realty Company office the next morning, February 14, 1970, at about 9:45 o'clock and discovered that the door of the Realty Company office was unlocked; that when he entered the building he found a piece of sheet metal on the floor and found a hole through the wall of the building extending on through the wall of the Bank building and into the Bank; that there was dust and debris around his office in the area where the hole was made; that he reported what he had discovered to the city police; that he could identify Plaintiff's Exhibit 19, and that it was an accurate photograph of and an accurate depiction of the view of the hole in the wall between his office and the Bank, taken from his office.

James A. Sacia, a Special Agent of the Federal Bureau of Investigation, hereinafter referred to as the F.B.I., testified as follows:

That he was employed by the F.B.I. as a Special Agent on February 14, 1970, and went to Park City on that day and proceeded directly to the Bank; that he arrived there about 11 a. m.; that upon entering the Bank, which was being kept secure by the city marshal and Mrs. Dearden, "we could see on the south side of the bank an acetylene and oxygen tank with hoses running from them directly to the front of the large vault area, which appeared to have been cut through with a torch, making a hole approximately nine by fourteen and a half inches"; that he also observed a hole extending through the wall of the ad-joining building and through the south wall of the Bank about 20 by 26 inches in diameter.

Sacia examined Plaintiff's Exhibits 18 and 19 and stated that they were photographs of the hole; that Exhibit 18 was a photograph taken from the Bank side, and Exhibit 19 was a photograph taken from the Gardner Realty Company side, and that they accurately depicted such hole. He further testified that the hole was about seven feet above the Bank floor. The exhibits were received in evidence without objection.

Sacia further testified that the hinge protruding into the vault door had been unbolted and pried back. He stated that he observed spots of a substance on the floor immediately below the hole in the vault door and spattered on the wall of the Bank that looked like blood. He identified photographs marked as Plaintiff's Exhibits 20 and 21 and testified that Exhibit 20 was a photograph of the hole in the vault door and that Exhibit 21 was a photograph of a secondary door in the vault, taken after the vault door was opened the afternoon of February 14, 1970.

Sacia further testified that there were numerous footwear prints on the floor, both in the Bank and in the Realty Company building, on a desk immediately below the hole in the Bank building, and on a window sill. He identified photographs of such footwear prints. He testified that there were two different sets of footwear prints, one set made by one person and one made by another person. The photographs were marked as exhibits and identified as such by Sacia. He testified that a number of the footwear prints appeared to have been made by a person wearing sneakers and that other footwear prints in the photographs appeared to have been made by another person wearing a different type of shoe. The photographs of the footwear prints were marked and introduced into evidence without objection.

Sacia identified by exhibit numbers the photographs of the footwear prints that appeared to have been made by

sneakers or tennis shoes (in the boyhood days of the writer of this opinion they were called "tennis shoes," but Webster's Unabridged Dictionary recognizes the word "sneaker" as U.S. slang), and those that appeared to have been made by some other type of footwear.

Sacia further testified that he attempted to lift certain of the footwear prints with a fingerprint-type lifting tape. Counsel for Smith stipulated that in so doing Sacia followed proper procedure and that any prints he was able to lift should be admitted in evidence.

Sacia testified that Plaintiff's Exhibit 11 was one of the footwear prints he lifted, and that it was on the one on the window sill. Counsel for Smith stipulated that it was one of the same prints that matched one of the exhibits. Sacia further testified that Plaintiff's Exhibit 28 was one of the footwear prints he lifted, and that it was one on the Bank floor, below the window sill. He further testified that he first saw Plaintiff's Exhibit 12, a pair of boots, when on February 17, 1970, he went to 2802½ West 3500 South; that he was accompanied by Deputy Sheriff Ned Frandson and Buck; that he believed Donald Buck resided at that address, but he was not certain. In this case, the testimony indicates that it was Smith's residence. Sacia further testified that the boots were in the possession of Buck the first time he saw them and were given to him by Buck; that he compared Exhibit 11, one of the prints he lifted, with the boots, Exhibit 12, with the use of a magnifying glass, and that the bootprint was made by boots that had neoprene soles, and that the boots in Exhibit 12 had neoprene soles.

Sacia further testified that he had seen Exhibit 28 before; that it was a lift of a footwear print made by a tennis shoe on the floor of the Bank building, directly below the window sill; that he compared Plaintiff's Exhibit 29, a tennis shoe, with Exhibit 28, the lift, and also compared Exhibit 29 with photographs of tennis shoe prints on the top of the chair and the top of the desk, using a magnifying glass; that he was able to determine that such tennis shoe prints were made by a similar type sole to the sole of Exhibit 29, and were within a half size of the tennis shoe marked Exhibit 29.

Exhibit 28 was received in evidence without objection and Exhibit 29 will be identified, infra.

The dried dark red substance which looked like blood was sent to the F.B.I. Laboratory, which was not able to determine from the sample that it was human blood.

Counsel for the parties stipulated that William E. Mawhinney, Jr., would testify to certain facts, which are the same facts set forth in the Buck Appeal, with respect to the breaking into of his locked garage on the night of February 13, 1970, and the taking of an oxygen tank, an acetylene tank, and the cutting equipment used therewith, which were marked Plaintiff's Exhibits 3, 4, and 5, and the taking of his son's leather jacket.

It was further stipulated that William E. Mawhinney, III, the son of William E. Mawhinney, Jr., would testify that his leather jacket was left at his father's garage the night of February 13, 1970, and later he discovered it was gone; that the jacket marked Plaintiff's Exhibit 14 was his missing jacket.

Joel Miller testified that he was a Deputy Sheriff of the Salt Lake County Sheriff's Office; that he knew Charles Smith, and he identified him in the courtroom. He further testified that he and Detective Fife of such Sheriff's Office saw Smith on February 17, 1970; that Smith was riding in a 1957 Oldsmobile; that they saw him later and impounded the Oldsmobile; that Smith then walked to 2802½ West 3500 South, Granger, Utah, a short distance; that Smith told them he lived there; that later they saw Smith driving a 1967 Ford. He identified a photograph marked as Plaintiff's Exhibit 15 as a photograph of the Ford. It was then stipulated between the parties that the Ford was registered in the name of Buck, not Smith.

Miller further testified that they stopped Smith twice while he was driving the Ford; that the second time they stopped him they arrested him for harboring a parolee and impounded the Ford; that they had been informed by a radio dispatch that Buck was an escaped parolee; that they made an inventory of the Ford.

Counsel for Smith objected, on the ground that what they found in the Ford had no relationship to the arrest and no connection with Smith. The objection was overruled.

Miller then testified that they found Exhibit 14, a leather jacket, in the trunk of the Ford; that they took Smith to the Salt Lake County Jail. On cross-examination, Miller testified that Smith was driving an Oldsmobile registered in California and using a Utah driver's license; that when they first stopped Smith driving the Ford, they asked him if he had permission to drive Buck's car, which Smith had picked up at a service station.

DeLynn Barkdull testified that he was employed by the Salt Lake County Sheriff's Department in the booking office; that he had seen Exhibit 29, a tennis shoe, before; that it was given to him by Charles Smith in the clothing room of the jail on February 17, 1970, the date he was booked. Barkdull identified Smith in the courtroom. Exhibit 29 was then received in evidence without objection.

Barkdull further testified that the customary footwear for inmates of the County Jail was tennis shoes. On redirect examination, he testified that the tennis shoes worn by the inmates were always white and that no black ones were used.

Lois Egan testified that Smith was treated at the Kearns Medical Center in Salt Lake City, Utah, for a smashed right hand middle finger; that he stated he received the injury while jacking up a car; that he had a one inch laceration and was given five sutures; that he gave his address as 2802½ West 3500 South, Salt Lake City, Utah.

John Bernardo testified that he was employed as a detective in the Salt Lake County Sheriff's Department on February 17, 1970; that he knew Donald David Buck; that about 11:30 a. m. of that day he and Detective Cannon went to the home of Charles H. Smith; that they had information that Buck was there, and that they found Buck hiding in the attic and arrested him on a parole hold. It was stipulated that Smith was given a ticket by Detective Fife about one week before February 17, 1970, for driving an automobile without a driver's license.

The Government then rested its case, and counsel for Smith made a motion that the court instruct the jury to return a verdict of acquittal, on the ground that the Government had failed to prove the charges against Smith and had presented no evidence connecting him to the crime. The court overruled the motion.

Counsel for Smith then stated that he desired to call F.B.I. Agent Charles Shepherd as a witness, but unfortunately Shepherd had had to leave town because of the illness of his mother and was not available. Counsel for the parties then stipulated that if Shepherd were called as a witness he would testify that on February 17, 1970, three days after the offense occurred, he interviewed one Donald Buck in the Salt Lake County Jail, at which time he observed scratches on both arms of Buck.

It was also stipulated between the parties that if Deputy United States Marshal Howard Griffith were called as a witness, he would testify that the morning of that day he went to the Salt Lake County Jail to pick up Smith and transport him to the federal courtroom; that at that time Smith had in his possession a pair of black tennis shoes, marked as Defendant's Exhibit A, and that in addition to this pair of nonwhite tennis shoes he observed the defendant with seven other pairs of tennis shoes not white in color.

The court sentenced Smith to the custody of the Attorney General or his

authorized representative for imprisonment for a term of 10 years on each count, to run concurrently.

We shall first consider Smith's contention that the court erred in overruling his motion for a verdict of not guilty on each count, on the ground that the evidence was insufficient to sustain verdicts of guilty.

■ In passing on the sufficiency of the evidence and the stipulated facts reflected by the record in the Smith Appeal to sustain the verdicts of guilty returned against Smith, we must efface from our minds all evidence and stipulated facts in the record in the Buck Appeal, which are not included in the evidence or stipulated facts in the record in the Smith Appeal—the fact that Buck confessed his guilt and in such confession implicated Smith, and the fact that Buck was tried and convicted on the joint charges.

It was the Government, not Smith, that sought and obtained separate trials of Buck and Smith.

Moreover, in passing on the sufficiency of the evidence to support a verdict of guilty in a criminal case, an appellate court will not weigh the conflicting evidence nor consider the credibility of witnesses and it must view the evidence and the reasonable inferences that may be drawn therefrom in the light most favorable to the prosecution and determine as a question of law whether there is substantial evidence, either direct or circumstantial, to support a verdict of guilty.[9]

The strongest evidence against Smith is the testimony of F.B.I. Agent Sacia, who testified that he went to the Bank about 11 a. m. on February 14, 1970; that the Bank was being kept secure by Mrs. Dearden and the city marshal; that he observed footwear tracks in dust, crushed mortar, and debris on the floor of both the Bank and the abutting Realty Company office beneath the hole that had been chiseled through the brick and mortar walls of the two buildings, on a desk and chair located in the Bank directly below the hole, on a nearby steel-barred window sill, and on a rubber mat near the teller's cage of the Bank; that he observed only two types of footwear prints, apparently made by only two people.

Sacia further testified that he made photographs of each of the two different footwear prints and attempted to make lifts of both sets of footwear prints, using the same method used in lifting fingerprints; that on February 17, 1970, at 2802½ West 3500 South, Granger, Utah, he obtained from Donald David Buck a pair of boots identified as Exhibit 12; that the boots had neoprene soles; that by the use of a magnifying glass he compared the neoprene soles of the boots with photographs and lifts of the footwear prints, which also showed they were made by footwear having neoprene soles, and that the soles of the boots, Exhibit 12, were similar to those shown in the photographs and lifts.

He testified that Exhibit 28 was a footlift which he had made from the print of a tennis shoe and also a photograph taken by him.

He also testified that Exhibit 29 was tennis shoes furnished him by another person; that by the use of a magnifying glass he made a comparison between Exhibit 28 and Exhibit 29, and that they were similar; that the tennis shoes, Exhibit 29, were within a half size of the footlift, Exhibit 28.

He further testified that by the use of a magnifying glass he made similar comparisons of Exhibit 29 with photographs and footlifts he had made in the Bank and the Realty Company office and concluded that they were similar and within a half size of each other.

9. Steiger v. United States, 10 Cir., 373 F. 2d 133, 135; Etheridge v. United States, 5 Cir., 380 F.2d 804, 809; Williamson v. United States, 5 Cir., 365 F.2d 12, 14; Feutralle v. United States, 5 Cir., 209 F.2d 159, 161; Sykes v. United States, 5 Cir., 373 F.2d 607, 609; Gorman v. United States, 5 Cir., 323 F.2d 51, 52.

It was further established that the tennis shoes, Exhibit 29, had been taken from Smith after he had been arrested by officers from the Sheriff's Department, when he changed to jail clothes in the clothing room of the jail, and had been given to Sacia.

Sacia testified that he endeavored to lift fingerprints in the Bank, two of which he thought were of possible value; that he turned them over to F.B.I. Agent George Larsen, who was the Agent in charge of the case. No further evidence was introduced with respect to the fingerprints, and they were not produced at the trial.

The testimony showed that Sacia did not recover and send to the F.B.I. Laboratory sufficient blood to enable it to determine whether it was human blood. It would seem there would have been much more blood than Sacia observed if it came from the injury suffered by Smith. The evidence showed that he had a smashed finger, that he was treated for a laceration, and it required five sutures to close the wound.

Good lifts of fingerprints furnish positive identification, because the fingerprints of no two persons are alike, but that cannot be said of lifts of footwear prints made by the soles of boots or tennis shoes. Boots with like soles are sold to large numbers of the general public. The same is true of tennis shoes. A photograph or a lift of a footwear print falls far short of identifying a person who wears boots or tennis shoes which make a similar print.

Counsel for the Government state that the footlifts and photographs showed that they matched the boots worn by Buck and the tennis shoes worn by Smith. We think the word "matched" is too strong a word. The testimony was that they were similar and within a half size of each other. Moreover, the statement "boots worn by Buck" is incorrect. See note 3 hereto.[10] Sacia's evidence as to the tennis shoes would have been valuable if there had been other evidence connecting Smith with the offenses charged, but we find no such other evidence in the record.

The facts that Smith was driving Buck's car at the time he was arrested, and that Miller found the leather jacket which had been taken from the Mawhinney garage in the trunk of the Ford at the time it was inventoried, do not show that the jacket was put there by Smith. Miller testified on cross-examination that he and Fife had Smith under surveillance at the time he left his house and walked to the service station, while he was at the service station, when he entered Buck's Ford and drove it away from the service station, and from that time on, until they placed him under arrest; and that they at no time saw him open the trunk of the Ford or put the stolen jacket into such trunk. And there was no evidence that Smith placed such jacket in Buck's Ford at any time. It could have been put in the trunk by Buck or it could have been put in the trunk by some other person, because it was several days after the jacket was stolen when it was found in the trunk of the Ford. Hence, the finding of the jacket in the trunk of the Ford did not tend to show that Smith was guilty of the crime charged.

The evidence that Smith and Buck were rather intimate friends or associates and that the offense was committed by two persons adds little to connect Smith with the offense. Furthermore, we do not recognize guilt by association.

10. There is no evidence in the Smith record that the boots, the soles of which were similar to the footwear prints lifted and the photographs thereof taken by Sacia, were in fact Buck's boots, or were worn by Buck when the burglary was committed. Those facts appear only in the Buck record. All that appears in the Smith record is that Buck picked up the boots in a closet in Smith's house and gave them to Sacia.

After a careful consideration of all of the evidence in the record, we conclude that the evidence was insufficient to sustain verdicts of guilty against Smith. In doing so, we have refrained from weighing any conflicts of evidence or considering the credibility of witnesses. Our conclusion was reached as a matter of law, after carefully considering the evidence as a whole, and viewing it and the inferences reasonably deductible therefrom in a light most favorable to the prosecution.

It becomes unnecessary to determine the other point raised, that the jacket was obtained from Smith by an illegal search.

The judgment in No. 563–70 is reversed.