**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 30 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ROBERT ARTHUR THAYER,

      Defendant - Appellant.

No. 00-1464
(D.C. No. 00-CR-232-M)
(D. Colorado)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HENRY**, Circuit Judge, **BRORBY**, Senior Circuit Judge,  and **ROGERS,** Senior District Judge.[**]

_____

      This is a direct appeal from defendant/appellant Thayer's conviction by a jury of

bank larceny in violation of 18 U.S.C. § 2113(b).  This statute provides:

> Whoever takes and carries away, with intent to steal or purloin, any
> property or money or any other thing of value exceeding $1,000 belonging
> to, or in the care, custody, control, management, or possession of any bank .
> . . shall be [guilty of an offense against the United States].

---

      [*]      This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court generally
disfavors the citation of orders and judgments; nevertheless, an order and judgment may
be cited under the terms and conditions of 10th Cir. R. 36.3.

      [**]      The Honorable Richard D. Rogers, United States Senior District Judge for
the District of Kansas, sitting by designation.

The issue before the court is whether the conviction is sufficiently supported by the evidence.

I

We inquire "'only whether taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999) (quoting United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.1996)). We "'may neither weigh conflicting evidence nor consider the credibility of witnesses.'" United States v. Pappert, 112 F.3d 1073, 1077 (10th Cir.1997) (quoting United States v. Harrod, 981 F.2d 1171, 1175 (10th Cir. 1992)). "'[T]he evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'" United States v. Clark, 57 F.3d 973, 976 (10th Cir. 1995) (quoting United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir. 1991)).

II

The evidence in this case demonstrated that on Saturday May 6, 2000, $162,120.00 was stolen from an automatic teller machine (ATM) owned by Norwest Bank in Denver, Colorado. The robbery occurred at approximately 1:30 a.m. Two overhead surveillance cameras were tilted up prior to the entry into the ATM so they could not film who committed the robbery. An internal camera inside the ATM and an internal camera inside

-2-

a nearby, nonfunctional ATM were covered with envelopes to block their view of the crime. An alarm which normally would sound if the ATM's vault was opened was not working.

The ATM was opened with a key; there was no forced entry. Once the machine was opened a combination had to be used to open the vault inside the ATM unless the combination was not "spun-off" by the last person to close the vault. Inside the vault were cassettes containing cash ready to be distributed to ATM users as well as a cash reserve to replenish the cassettes. This money was stolen. An audit tape of the vault indicated that the vault was opened for 23 seconds during the robbery.

Although the ATM was owned by Norwest Bank, it was serviced for Norwest by a company named Bantek West, Inc. At approximately 7:00 a.m. on May 6, 2000, a Bantek maintenance technician, Edward Samaniego, was called to check on the machine because there had been no transactions on it for a period of time. At approximately 8:00 a.m. when he arrived at the ATM, he disarmed the alarm, removed the envelope blocking the internal camera, unlocked the ATM and dialed the combination to open the vault. He discovered that the cassettes and the cash were missing and called his supervisor. Cash and checks deposited in the machine by ATM users were not taken in the robbery. This money amounted to more than $29,000.00.

The robbery was investigated by Bantek and the FBI. Defendant worked as a first-line maintenance technician for Bantek. The ATM that was robbed was on defendant's

regular afternoon route. He serviced the machine during the afternoon of Friday, May 5, 2000, the afternoon before the robbery. Defendant had a key to open the ATM and the combination to enter the vault.

Bantek officials spoke to defendant on May 6, 2000 at approximately 7:30 p.m. During this interview defendant was able to describe his work activities in detail. When asked whether he spun-off the combination on the ATM the afternoon before the robbery, defendant was certain that he did.

Defendant was again interviewed on Monday evening, May 8, 2000. Again, he said that he spun-off the combination. However, when defendant was asked to give a written statement and after he was told that the number of possible suspects would expand if he had not spun-off the combination, defendant stated that he had just remembered that he had not spun-off the combination. He was certain, though, that he had spun-off the combinations on the other machines he serviced that day.

Defendant was asked how he would rob the ATM. He made a detailed response which matched the method apparently used to loot the ATM in this case. The night of the robbery, defendant said he played pool at a bar, left about 1:30 a.m., drove to the house of a friend of a woman he met at the bar that night, and spent the night with the woman. Defendant said he was intoxicated. The woman's name was Renee, but defendant could not give his interrogators her last name or telephone number. This interview ended about midnight.

-4-

The next morning, Tuesday, May 9, 2000, defendant gave Bantek officials the telephone number of Renee and filled out a time line of his activities during the time period surrounding the robbery. Tuesday afternoon defendant was interviewed by FBI agents. Defendant first told the agents that at the bar the night of the robbery he told a person he could not identify or describe about the ATM, but that he did not give the person his key. He speculated that maybe someone overheard him talk about the ATM. Later, he said he gave information about the ATM and his key to someone named "Brett." Defendant did not know the last name of this person and said he had met him for the first time that night. Then, defendant added: that there was a black male at the bar who was involved as well; that defendant would receive some of the robbery proceeds; and, contrary to his previous statement, that he and Brett had previously discussed robbing an ATM. Defendant wrote a statement for the FBI agents which was read into the record as follows:

> I left a combo undone and disclosed all of the necessary information to Brett and his unknown friend. I went into detail about the location, cash amount, cameras and entry. I informed him to keep me out of loop as to how they would do it. We would meet again three weeks later to get my share. I also had an alibi set up to cover me for the evening and into the morning. I went over to her . . . friend's house and spent the rest of the evening with her. I have no way of getting in touch with Brett or where he lives. My alibi was going to get one-half of my share. The reason I did this was the temptation of the money, and I'm very sorry that I have disgraced myself and the position of trust placed in me. The location of the ATM is 1001 South Monaco, Norwest.

III R. 254.

The following day, Wednesday, May 10, 2000, defendant was again interviewed by Bantek officials who wanted to know where the money was. Defendant initially said he did not know, but later said the money was behind the bar where he had shot pool the night of the robbery. Defendant indicated that the persons who robbed the ATM were going to leave defendant's share at that location. Then, the Bantek interrogators and defendant drove to the bar. No money was found and defendant said that the persons who robbed the ATM must have kept the money.

The investigators told defendant that he must know where the money is. Defendant then changed his story and said that the money was at Renee's friend's house. Defendant said that after the robbery the people who actually took the money met back at Renee's friend's house in the kitchen. They decided how the money would be split, but decided to leave the money there and not split it for two or three weeks. Defendant wrote a statement that was read into the record as follows:

> Saturday morning, Brett brought the money to Hilary's house, all the money. We all looked at it and decided to keep it there for a couple of weeks. We would then all meet there again and divvy up the money. Hilary and family get 25 K, Renee gets 25 K, I got 30 K, Brett and his friends get 40 K apiece. K meaning thousand.

III R. 354.

The Bantek officers also asked defendant about a theft of $3,000.00 from a different ATM that defendant serviced. Defendant said that he had taken the money to prove to the fellows at the bar that he had access to an ATM vault. He said the money

-6-

was at his parents' house where he was living.

Wednesday afternoon, defendant spoke with the FBI again. He informed the FBI that he told the Bantek officers the money might be at the bar because they threatened to search his parents' house. The FBI learned that Renee's friend was a woman named Hilary whose husband was James. Defendant told the agents that James was the black male at the bar who was involved with "Brett" in the robbery. This time he said that he had discussed robbing an ATM with James on previous occasions. He spoke in some detail concerning where he was during the robbery and of Brett, James, Hilary, Renee and defendant meeting at Hilary's house to split the money.

During the early evening, a consent search was conducted at Hilary's house. No money was found and it was discovered that Hilary's husband, James, was not a black male. The agents then moved on to defendant's parents' house about 9:00 p.m. The agents spoke with defendant and his parents at the same time. FBI agent John Broadway testified that he asked if defendant knew the bar owner's husband, Jeff. Defendant replied affirmatively and stated that Jeff knew about the deal. Then the agent suggested that defendant took the money. According to Agent Broadway's testimony, defendant replied that he had taken the money and had not given the information about the ATM to anybody else. Defendant told the agent that he dropped the money off on the way to Hilary's house to see Renee. Then, he said he put the money in Renee's car at Hilary's house and that Renee was in charge of securing the money, but he did not know where.

The agent was asked how defendant was acting as he made these statements. The agent responded:

> Shaking, emotional. And, you know, we asked him, because he did, he appeared to be very, very frightened, and I asked him what are you afraid of, why can't you tell us where the money is, and he said I'm afraid because I'm afraid I'm the only one going to be going to jail, because I can't tell you where the missing money was–or missing money is.

III R. 271.

Defendant was arrested that night at his parents' house.

A consent search of defendant's parents' house discovered no money connected with the crime charged in this case or the theft of $3,000.00 from the other ATM serviced by defendant. No one named "Brett" was ever identified from interviews with bar patrons. No money or other evidence of the crime was found. Fingerprints belonging to Edward Samaniego were discovered on one of the envelopes that blocked an internal camera. Fingerprints on another envelope were not matched with defendant or anyone else identified in the investigation. DNA obtained from one of the envelopes that had been licked did not match with the defendant.

The woman identified as Hilary testified that her friend Renee did have brief relationships or one-night stands. She further testified that on the night of the robbery Renee did invite a man to Hilary's home, although Hilary had asked Renee not to because there were children staying at the home. When Hilary discovered Renee and the man at about 6:00 a.m., she asked them to get out. Hilary stated that the man resembled

defendant, but she could not be positive that it was him. Telephone records were admitted showing calls from defendant's cell phone to Renee's phone at 12:46 a.m., 12:50 a.m., 12:53 a.m. and 12:55 a.m. on May 6, 2000. Defendant testified that these calls were made to inform Renee that he was coming and to receive her help as he was driving with finding the right address. Hilary testified that she noticed no signs that Renee had benefitted from a financial windfall and that she had loaned Renee money to make a car payment some time after May 6, 2000.

Loreena Jarko, a Bantek technician, testified that defendant knew prior to May 6, 2000 that the alarm on the ATM was not functioning. She said that she noticed the malfunction on May 4, 2000 and told defendant the same day.

Two people who worked at the bar where defendant said he was the night of the robbery testified that they saw defendant there. One of them testified that defendant left the bar sometime between 9:00 p.m. and 1:00 a.m. The bar was approximately four miles from the ATM that was robbed.

Defendant testified that he made inculpatory statements only to get his interrogators to relent from their lengthy and stressful questioning. He testified that he arrived at Hilary's house to meet Renee at approximately 12.54 a.m. on May 6, 2000 and that he was there the rest of the night. He stated that he was not intoxicated. This was contrary to defendant's original statement that he left the bar around 1:30 a.m. and that he was intoxicated. Defendant's interrogators testified that they did not pressure defendant

into making inculpatory statements. They said they did not raise their voices or threaten

defendant to make him confess.

III

Defendant contends that the evidence in this case is insufficient to establish a

material element of the crime, that defendant carried or took away an excess of $1,000.00

from the ATM. In support of this contention defendant cites several cases in which the

absence of evidence placing a defendant at the scene of the crime caused convictions to

be overturned for insufficiency of the evidence. For example, defendant cites <u>United

States v. Buck</u>, 449 F.2d 262 (10th Cir. 1971).[1] In <u>Buck</u>, a defendant was arrested driving

a friend's car which contained tools and a jacket which were stolen on the same night as

the tools were used for a bank burglary by two persons. There was also evidence that

shoes and boots taken from the defendant's residence had prints similar to shoe prints

taken at the scene of the bank burglary. This court held this evidence insufficient to

establish that defendant was at the bank burglary.

We agree with plaintiff/appellee's position that <u>Buck</u> and the other cases cited by

defendant are distinguishable from this case because those cases did not have a

---

[1] Defendant also cites: <u>United States v. Jensen</u>, 462 F.2d 763 (8th Cir. 1972); <u>United States v. Bamberger</u>, 456 F.2d 1119 (3rd Cir. 1972) <u>cert. denied</u>, 413 U.S. 919 (1973); <u>United States v. Johnson</u>, 427 F.2d 957 (5th Cir. 1970); <u>United States v. Grey</u>, 422 F.2d 1043 (6th Cir.) <u>cert. denied</u>, 400 U.S. 967 (1970); <u>United States v. Jones</u>, 418 F.2d 818 (8th Cir. 1969); <u>United States v. Garrett</u>, 371 F.2d 296 (7th Cir. 1966); <u>United States v. Nazarok</u>, 330 F.Supp. 1054 (E.D.Pa. 1971).

confession admitting to the defendant's presence at the scene of the crime and to taking the money alleged to have been stolen.

In response to this argument defendant replies that his statement placing him at the ATM where he took the money is unreliable in light of his other inconsistent statements and the pressure allegedly imposed upon him by his interrogators. This is an issue which was squarely before the jury. The jury was instructed to consider the evidence of defendant's statements with caution and weigh it with great care, and to disregard the evidence entirely unless convinced that the statement was made knowingly and voluntarily. The jury was also instructed to consider the age, training, education, occupation, and physical and mental condition, as well as the defendant's treatment under interrogation. Under the well-established standards governing our review on appeal, the court shall not overturn the jury's assessment of defendant's statements to the FBI agents and Bantek officials.

Defendant also replies that his conviction should not be sustained "merely on the Defendant's alleged corroborating confession," citing United States v. Chimal, 976 F.2d 608, 610 (10th Cir. 1992) cert. denied, 507 U.S. 938, 113 S.Ct. 1332, 122 L.Ed.2d 715 (1993). Reply brief, p. 5.

Chimal, which is also cited by plaintiff, discusses the rule stated in Smith v. United States, 348 U.S. 147 (1954) that a conviction may not be based upon an accused's extrajudicial uncorroborated confession. The justification for the rule:

-11-

lies in a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused. Confessions may be unreliable because they are coerced or induced, and although separate doctrines exclude involuntary confessions from consideration by the jury [citations omitted], further caution is warranted because the accused may be unable to establish the involuntary nature of his statements. Moreover, though a statement may not be "involuntary" within the meaning of the exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation–-whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past. Finally, the experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made, Note, 28 Ind. L. J. 374. These are the considerations which justify a restriction on the power of the jury to convict, for this experience with confessions is not shared by the average juror. Nevertheless, because this rule does infringe on the province of the primary finder of facts, its application should be scrutinized lest the restrictions it imposes surpass the dangers which gave rise to them.

348 U.S. at 153.

Smith involved a crime, tax evasion, in which the identity of the accused was inseparable from proving the existence of the crime. In a case such as the one at bar involving a loss of property, proof of corpus delicti in addition to the confessed identity of the perpetrator is considered sufficient proof to sustain a conviction. Thus, in Wong Sun v. United States, 371 U.S. 471, 489 n.15, 83 S.Ct. 407, 418 n.15, 9 L.Ed.2d 441 (1963), the Court stated:

Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable.

The Tenth Circuit has followed this approach in several cases. U.S. v. Wiseman,

172 F.3d 1196, 1213 (10th Cir.) cert. denied, 528 U.S. 889 (1999) (affirming convictions in Hobbs Act case involving grocery store robberies although store employees in two of the robberies could not identify the accused who confessed to the robberies); United States v. Treas-Wilson, 3 F.3d 1406, 1409 (10th Cir. 1993) cert. denied, 510 U.S. 1064 (1994) (dead body and manner of death establish the trustworthiness of defendant's confessions); United States v. Wilson, 529 F.2d 913, 915 (10th Cir. 1976) (in weapon conveyance trial, it was unnecessary that there be independent corroborative evidence that it was the accused who perpetrated the crime, the confession alone was sufficient); United States v. Begay, 441 F.2d 1136, 1137 (10th Cir. 1971) (evidence of store burglary consistent with confession is sufficient to support conviction); Felton v. United States, 344 F.2d 111, 112 (10th Cir. 1965) (evidence of theft from a mail depository is sufficient to substantiate defendant's admissions to the crime). See also, United States v. Wolfenbarger, 696 F.2d 750, 753 (10th Cir. 1982) ("[t]he corroborating evidence must go to the believability of the statement, not to the commission of the crime"); United States v. Opdahl, 610 F.2d 490, 493-94 (8th Cir. 1979) cert. denied, 444 U.S. 1091 (1980) (in bank robbery case, corroborative evidence of accused's identity is unnecessary in addition to evidence of the robbery); United States v. Johnson, 589 F.2d 716, 719 (D.C.Cir. 1978) (same principle applied to robbery of credit union); United States v. Daniels, 528 F.2d 705, 707-08 (6th Cir. 1976) (same principle applied in bank robbery case); United States v. Hall, 396 F.2d 841, 844-45 (4th Cir.) cert. denied, 393 U.S. 918 (1968) (evidence that a

bank robbery occurred is sufficient to corroborate defendant's confession).

In the instant case, the evidence clearly established that money was stolen from the Norwest Bank ATM on May 6, 2000 at approximately 1:30 a.m. A crime was committed and defendant confessed to committing the crime by personally taking the money. This is sufficient to support the conviction. It is also noteworthy that the evidence showed: defendant had a key to open the ATM; defendant knew the combination to enter the vault inside the ATM or could have failed to spin off the combination when he serviced the machine the afternoon before the robbery; and defendant was aware that the alarm which normally sounded when the ATM vault was opened did not work. He had the kind of experience with the machine which was consistent with the execution of the crime. This provides further corroboration for his confession.

IV

In sum, we find that there is sufficient evidence to support the conviction in this case. The judgment of conviction is affirmed.

ENTERED FOR THE COURT

Richard D. Rogers
Senior District Judge

-14-