Randall Lee ETHERIDGE, Robert D'Orsay, Robert E. Spinning and Robert Vincent Smith, Appellants,

v.

UNITED STATES of America, Appellee.

No. 23270.

United States Court of Appeals Fifth Circuit.

July 11, 1967.

Rehearing Denied Aug. 14, 1967.

Hal Ives, Ives & Davis, West Palm Beach, Fla., Ray Sandstrom, Fort Lauderdale, Fla., J. Luther Drew, West Palm Beach, Fla., for appellants.

Lloyd G. Bates, Jr., Asst. U. S. Atty., William A. Meadows, Jr., U. S. Atty., Miami, Fla., for appellee.

Before PHILLIPS,* JONES and THORNBERRY, Circuit Judges.

PER CURIAM:

The first count of a three-count indictment charged that Etheridge, D'Orsay, Spinning and Smith from prior to August 1, 1964, to on or about October 1, 1964, did conspire with each other to violate 22 U.S.C. § 1934 and rules and regulations duly promulgated thereunder, by knowingly, wilfully, and unlawfully exporting from the United States to Haiti arms, ammunition and implements of war, designated by the United States Munitions List, 22 C.F.R. § 121.01, Category VIII (a), without having obtained an export license or written approval from the United States Department of State so to do;

The second count charged that Etheridge, D'Orsay and Spinning wilfully and unlawfully on September 5, 1964, did export from the United States an article within the category designated by the United States Munitions List, 22 C.F.R. § 121.01, Category VIII (a), to wit, a T–28 aircraft, Registration No. N9688C, without having obtained a license or written approval for the exportation thereof from the Department of State; and the third count charged Etheridge, D'Orsay and Smith with a

---

* Of the Tenth Circuit, sitting by designation.

like unlawful exportation on September 13, 1964, of a T–28 aircraft, Registration No. N3336G.

Each of them was found guilty on Count One. Etheridge, D'Orsay and Spinning were found guilty on Count Two, and Etheridge, D'Orsay and Smith were found guilty on Count Three. Sentences were imposed and they have appealed.

About the middle of August, 1964, Etheridge met Fred Rhea, an FAA-licensed aircraft mechanic and inspector, and discussed with him a deal Etheridge had with the Government of Haiti to sell to it 20 T–28 aircraft for $10,000 each. Etheridge told Rhea no licensing would be required, because the aircraft would not be flown in the United States. He asked Rhea if he could do the mechanical and inspection work required to make the aircraft airworthy. About two weeks thereafter, Rhea introduced D'Orsay, an aircraft broker, to Etheridge. Etheridge told D'Orsay about the deal he had with the Government of Haiti for the sale of 20 T–28 aircraft for $10,000 each, delivered in Haiti, and asked D'Orsay if he could locate aircraft that could be purchased to fill the order. D'Orsay answered in the affirmative. About September 1, 1964, D'Orsay told Rhea he had located two T–28 aircraft in Naples, Florida. Thereafter, D'Orsay purchased both aircraft for $4,000 from one Hill, and Rhea agreed to inspect the aircraft and put them in airworthy condition. D'Orsay told Rhea the aircraft were going to Haiti and that he would receive $10,000 for each of them. One of them, which bore Registration No. N9688C, was flown from Naples to Opa-Locka Airport, located west of North Miami Beach, Florida. Such aircraft was equipped with an auxiliary gas tank to increase its flight range without refueling, and on about September 6, 1964, it was flown by Spinning from Opa-Locka Airport to Haiti. Later, D'Orsay told Rhea the Haitian Consul had the money to pay for the aircraft, and a few hours there-

after D'Orsay told Rhea he had been paid for the aircraft.

About September 11, 1964, one Armstrong flew a T–28 aircraft from Sarasota, Florida, to Opa-Locka Airport, where it was purchased by D'Orsay for $4,500. It bore Registration No. N3336G. An auxiliary gas tank was installed on it and on September 14, 1964, Smith flew the aircraft to Port-au-Prince, Haiti, and there saw the T–28 aircraft which had been flown to Haiti by Spinner. On his return trip from Haiti, Smith used the alias, "Robert Walker."

The investigation of the offenses charged in the indictment was carried on by Customs Agents Stanley Schachter and Wallace Shanley. About three or four days after Smith left for Haiti with T–28 N3336G, Schachter and Shanley interviewed Rhea, who was working on the other aircraft purchased from Hill. At the end of the interview Shanley told Rhea to continue working on the aircraft and notify Shanley when it was to leave.

No license or permit was issued by the Department of State for the export of either aircraft from the United States to Haiti.

The purchase price of $10,000 for each plane delivered was to be collected by D'Orsay, and he was to pay $2,000 thereof to Etheridge.

"T–28" is a designation adapted and used by the United States to identify a series of aircraft manufactured by the North American Aviation Company for the United States between the years 1948 and 1953, to be used by the military forces.

The two planes herein involved were designated as T–28A and were designed for use as military trainers. The T–28As were equipped so the trainee would learn to sight and fire machine guns and release and deliver on target, bombs and rockets from the plane. They were equipped with the structures, including shelving, brackets, gunsight systems and wiring therefor of a fighter

aircraft. They can readily be made operational as a trainer or fighter plane and are usable for attack missions by the military. They can carry 100 pound bombs and 50 caliber machine guns.

Much of the structures needed by the T-28As for use as military trainers and for making them operational as fighter planes were on the two aircraft here involved.

■ Evidence of facts and circumstances introduced at the trial afforded adequate support for a finding by the jury that each of the defendants knew it was unlawful to export from the United States to Haiti the aircraft which Spinner and Smith flew from Opa-Locka to Haiti.

After the major portion of the Government's evidence had been introduced, it developed that Etheridge occupied a room in the Miami Airways Hotel on the afternoon of September 24, 1964; that before Etheridge arrived, Schachter arranged with the hotel management to monitor telephone conversations over the telephone in Etheridge's room, and also concealed a microphone in Etheridge's room, by which he could hear and tape-record conversations in Etheridge's room, in a room across the hall occupied by Schachter; and that on the afternoon of September 24, 1964, while Ethridge occupied his room at the hotel, Schachter monitored two outgoing telephone calls between Etheridge and a third party, and also heard and made a tape recording of a conversation between one Leon Cruger and Etheridge in the latter's room. Prior to the trial below, Schachter erased the recording on the tape.

When it was developed on the cross-examination of Schachter that he had monitored telephone conversations between Etheridge and a third party and listened to and tape-recorded a conversation between Etheridge and Leon Cruger, transmitted by the concealed microphone in Etheridge's room, the trial judge interrupted the trial for the purpose of determining whether the evidence secured, either by the monitored telephone conversations or the conversation transmitted by the microphone, or evidence obtained through leads from such conversations, had been introduced at the trial. The trial court conducted a full and exhaustive inquiry and at the beginning held that since the unlawful conduct of the Government's agents had been admitted, the burden was on the Government to prove that none of the evidence that had been introduced was derived from or tainted by the agents' unlawful conduct.

■ The court properly gave each defendant an opportunity to establish that the Customs Agents, either by such monitoring of telephone conversations or by the conversation with Cruger transmitted by the microphone, secured evidence introduced against him at the trial, or secured leads to evidence introduced against him at the trial.[1]

Both Schachter and Shanley were cross-examined by counsel for the defendants and were interrogated both by the court and by the counsel with respect to evidence secured from the monitored telephone conversations or the conversation with Cruger transmitted by the microphone.

At the end of the hearing, the court found that neither the monitored telephone conversations nor the conversation with Cruger, transmitted by the microphone, had "led to the obtaining of any information which in turn led to the discovery of any evidence already introduced at the trial," and that the Government had sustained its burden so to establish.

1. Hoffa v. United States, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738, decided May 27, 1967. In that case the court said at page 233, 87 S.Ct. at page 1584:

"We do not accept the Solicitor General's suggestion that such an inquiry should be confined to the conviction of Burris. We consider it more appropriate that each of these petitioners be provided an opportunity to establish, if he can, that the interception of this particular conversation, or of other conversations, vitiated in some manner his conviction. * * *"

■ It is settled law that the Government may not use the fruits of the unlawful conduct of its agents, that is, either physical or intangible evidence secured thereby, nor can it use evidence obtained through leads from the unlawfully obtained evidence. The evidence directly obtained and that obtained through such leads is tainted by the unlawful conduct.[2]

■ However, the connection between the unlawful conduct and the discovery of the challenged evidence may be so attenuated as to dissipate the taint and render the exclusionary rule inapplicable,[3] and the facts obtained through the unlawful conduct do not become "sacred and inaccessible." If knowledge of such facts is discovered through a source independent of the unlawful conduct, evidence of such facts wholly apart from the unlawful conduct is admissible.[4]

While counsel for the defendants do not assert that any evidence directly obtained by the monitored telephone conversations and the conversation with Cruger, transmitted by the microphone, was introduced at the trial, they strongly urge that those conversations gave the agents leads through which they discovered other evidence introduced at the trial, which was tainted by the unlawful conduct and thereby rendered inadmissible.

The Government does not deny that the monitoring of the telephone conversations and the listening to and recording of the conversation between Etheridge and Cruger, transmitted by the concealed microphone, were unlawful, and that what they thereby discovered led them to interview Cruger. It asserts, however, that no evidence discovered through the monitoring and eavesdropping was introduced at the trial; that no evidence obtained by leads from the unlawfully obtained evidence was introduced at the trial, and that all evidence introduced was discovered through sources independent of and wholly apart from such unlawful conduct.

The agents did learn of Leon Cruger through such unlawful conduct and on October 4, 1964, interviewed Cruger and thereby learned that Cruger accompanied Etheridge on a trip to Haiti for the purpose of discussing what would be needed to arm the aircraft, and of discussions between Etheridge and representatives of the Government of Haiti respecting the condition of the aircraft. However, Cruger did not testify either before the grand jury or at the trial and no evidence of the facts learned from Cruger was introduced at the trial. The defendants assert the agents obtained from Cruger the name of Leo R. Bustani, which led them to evidence testified to by Bustani before the grand jury and at the trial. We doubt that the record sustains the contention that the agents learned of Bustani through Cruger or through the monitored telephone conversations and the conversation transmitted by the concealed microphone, but, be that as it may, the agents testified that they learned of Bustani from a wholly independent source, to wit, a report of the F.B.I. furnished to them, and their testimony in that respect was fully corroborated by documentary evidence. Moreover, the agents did not interview Bustani until May, 1965, which was after they received the F.B.I. report and long after they interviewed Cruger.

■ After a careful examination of the evidence adduced at the trial and at the inquiry conducted by the court in the absence of the jury, we are convinced that it was the F.B.I. report that led to the discovery of the facts testified

2. Walder v. United States, 347 U.S. 62, 64–65, 74 S.Ct. 354, 98 L.Ed. 503; Wong Sun v. United States, 371 U.S. 471, 484, 486, 83 S.Ct. 407, 9 L.Ed.2d 441; Nardone v. United States, 308 U.S. 338, 341, 343, 60 S.Ct. 266, 84 L.Ed. 307; See also 47 U.S.C.A. § 605, 48 Stat. 1103.

3. Nardone v. United States, supra, at page 341, 60 S.Ct. 266.

4. Nardone v. United States, supra, at page 341, 60 S.Ct. 266; Wong Sun v. United States, supra, at page 485, 83 S.Ct. 407; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L. Ed. 319.

to by Bustani, and that none of the evidence adduced by the Government at the trial was discovered from the monitored telephone conversations, the conversation transmitted by the microphone, or from the interview with Cruger, and that the conversations so heard and the interview with Cruger did not give the agents leads through which they discovered other evidence introduced at the trial, and that the agents were led to and learned of the facts and the evidence thereof introduced at the trial through sources entirely independent of such telephone conversations and interview with Cruger.

After the agents had information connecting each of the defendants with the offenses charged in the indictment and before the return of the indictment, either Schachter or Shanley interrogated Smith, Spinning and D'Orsay. Each of them made some incriminating admissions to the agents. There were no efforts made to put the defendants in fear. They were not subjected to any physical or psychological mistreatment and no promises or inducements were held out to them to persuade them to give a statement, and they were not under arrest.

However, none of such defendants was advised of his right not to be interrogated, of his Constitutional privilege against self-incrimination, of his right not to make a statement, and his right to counsel before being interrogated and at any interrogation, and none of the defendants was warned by either Schachter or Shanley that any statement he made would be used against him.

■ The offenses charged were committed, the interrogation of Smith, Spinning and D'Orsay, the return of the indictment, and the trial below all occurred prior to the Supreme Court's decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, decided June 13, 1966. That decision applies only to those cases, the trial of which began after June 13, 1966.[5]

■■ We are of the opinion, under the pertinent facts and circumstances shown by this record, that the failure of the agents to advise and warn each defendant, as stated above, did not render the defendant's statement involuntary or inadmissible, and that the applicable law prior to Miranda v. Arizona, supra, did not require that defendant be furnished with counsel prior to and during any interrogation by Government agents. In this view we are supported by the decision of the Second Circuit with respect to the pre-Miranda rule in United States v. Cone, 2 Cir., 354 F.2d 119.

■ It seems obvious to us that each count of the indictment sets forth all of the elements of the offense intended to be charged thereby, and does so with sufficient particularity to apprise each defendant of the charge against him and to enable him to prepare his defense thereto and to plead former acquittal or conviction in the instant case as a bar to another prosecution for the same offense. Hence, each count of the indictment was sufficient.[6]

■ In passing on the sufficiency of the evidence to support a verdict of guilty in a criminal case, an appellate court will not weigh conflicting evidence nor consider the credibility of witnesses, and it must view the evidence in a light most favorable to the Government and determine the question of law, as to whether there is substantial evidence, either direct or circumstantial, which, together with the reasonable inferences that may be drawn therefrom, sustains the verdict.

---

5. See Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

6. United States v. Chunn, 4 Cir., 347 F. 2d 717, 720; Johnson v. United States,

5 Cir., 207 F.2d 314, 319; Marshall v. United States, 5 Cir., 140 F.2d 261, 262; Russell v. United States, 369 U.S. 749, 763, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240.

We have carefully examined the evidence and are of the opinion that under the tests laid down above, the evidence sustained each verdict of guilty.

Affirmed.