**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sterling Blake DAVIS, Sr., and William**
**McCoy Hill, a/k/a Mike Hill,**
**Defendants-Appellants.**

No. 76–4504.

United States Court of Appeals,
Fifth Circuit.

Nov. 3, 1978.

Charles Clark, Circuit Judge, filed an opinion concurring in part and dissenting in part.

Joe S. Petsch, Del Rio, Tex. (Court-appointed), for Davis.

Gerald H. Goldstein, San Antonio, Tex., Edward A. Mallett, Houston, Tex., for Hill.

Sterling Blake Davis, Sr., pro se.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, W. Ray Jahn, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

This case arises from an international raid of some notoriety in which Sterling Davis, Sr.'s son and other American prisoners were freed from a Mexican jail by armed persons who crossed into Mexico from the United States. Both Sterling Davis, Sr. ("Davis") and William Hill were convicted of conspiracy to *export* a weapon on the Munitions List without an export license or written approval from the State Department, in violation of 22 U.S.C. § 1934(c) and

18 U.S.C. § 371, the general conspiracy statute. As it read at the time of the indictment,[1] § 1934 provided for control of export and import of arms. Subsection (a) authorized the President to designate articles that shall be considered arms for the purposes of § 1934, and articles so designated are known as the Munitions List, which appears at 22 C.F.R. § 121.01. The weapon involved in the conspiracy to export count was a sawed-off shotgun which the government asserted fell under the Munitions List designation of a shotgun with a barrel less than 18 inches in length.

Hill was also convicted of the substantive offense of unlawfully *importing* a firearm in violation of 18 U.S.C. § 922(*l*), which makes it unlawful for any person knowingly to import into the United States any firearm or ammunition. The firearm involved in this count was an unaltered shotgun. We are not faced with the question whether the activities of Davis and Hill constituted other offenses against the United States.

We reverse the convictions.

## I. The Facts.

Davis's son was imprisoned on a narcotics charge in the jail at Piedras Negras, Mexico, just across the border from Eagle Pass, Texas. Davis offered $5,000 to Fred Graves to free his son. Graves declined the offer but suggested to Donald Fielden that he consider the offer. When Fielden contacted Davis, Davis repeated the offer and the two discussed logistics, including the use of a shotgun. Fielden investigated Piedras Negras and its jail and visited with Davis's son, then contacted Davis and again discussed logistics. Fielden informed Davis that he would need assistance and once again mentioned the use of a shotgun. Fielden obtained the assistance of ' Hill, whom Graves had suggested might help.

Fielden and Hill went to Eagle Pass, and Fielden talked with Davis by telephone. Fielden and Hill crossed into Mexico to attempt the jailbreak but aborted their plans and returned to the United States. On this trip they carried in the car an unaltered shotgun belonging to Hill and a sawed-off shotgun.

Hill recruited Billy Jack Blackwell as a lookout. The three—Hill, Fielden and Blackwell—went to Eagle Pass, where Fielden had another telephone conversation with Davis. Blackwell walked across the border and reported his observations of the jail over a walkie-talkie. Fielden and Hill crossed the border with the two shotguns. At the jail the three forced the guards to surrender, taking an M–1 carbine from one guard, then freed Davis's son along with other American prisoners. The record does not show that anyone was injured during the jailbreak. As the three actors returned across the border with Davis's son, the M–1 and the sawed-off shotgun were thrown into the Rio Grande. The unaltered shotgun remained in the car's trunk. When stopped at U.S. Customs, Hill, the owner of the shotgun, did not declare that he was bringing it into the country. Once they were in Eagle Pass, Davis was called by telephone. Davis's son was brought to Dallas and Davis paid Fielden $5,000.

## II. Specific intent under the conspiracy to export count.

The convictions of both appellants under the conspiracy to export count must be reversed because the court erroneously instructed the jury with respect to intent.

### A. Degree of intent required.

■■ To sustain a conviction on a charge of conspiracy to commit an offense against the United States the government must prove at least the degree of criminal intent necessary for the substantive offense, *Ingram v. U. S.*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503, 1508 (1959); *see U. S. v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541, 554

---

1. Since the indictment was returned, § 1934 was repealed by the International Security Assistance and Arms Export Control Act of 1976, Pub.L. 94–329, Title II, § 212(b)(1), 90 Stat. 745, and superseded by 22 U.S.C. § 2778.

(1975), in this case the substantive offense of exporting a weapon on the Munitions List. Section 1934(c) provides:

> Any person who *willfully* violates any provision of this section or rule or regulation issued under this section . . . shall upon conviction be fined not more than $25,000 or imprisoned not more than two years, or both.

22 U.S.C. § 1934(c) (emphasis added). In *Etheridge v. U. S.*, 380 F.2d 804 (CA5, 1967), we sustained convictions under an indictment charging that the defendants "knowingly, wilfully, and unlawfully" exported articles on the Munitions List without having obtained an export license or written approval from the State Department. We said that the count set forth all of the elements of the offense. In reviewing the sufficiency of the evidence, however, we stressed, "Evidence of facts and circumstances introduced at the trial afforded adequate support for a finding by the jury that each of the defendants *knew it was unlawful* to export [an article on the Munitions List]." 380 F.2d at 807 (emphasis added). Thus *Etheridge* suggests that specific intent is required, even though the opinion did not squarely address the question of degree of intent. In *U. S. v. Lizarraga-Lizarraga*, 541 F.2d 826 (CA9, 1976), the Ninth Circuit held that § 1934's requirement of wilfulness connotes a voluntary, intentional violation of a known legal duty. Because the items covered by the statute are spelled out in administrative regulations and include items not known generally to be controlled by the government, the Ninth Circuit inferred that Congress did not intend to impose criminal penalties on innocent or negligent errors. We are persuaded by this analysis and agree that § 1934 requires specific intent.[2]

**B. The district court's construction.**

 The district court correctly instructed the jury:

> The word willfully as used in this charge means that the act or omission or failure to act was committed by the Defendant knowingly, voluntarily and intentionally, and with knowledge that it was prohibited by law, and with the purpose to disobey or to disregard the law, and not by mistake, accident or in good faith or other innocent reason or motive.

The court, however, then went on to say:

> An act is done knowingly if it is done willfully and intentionally, if done voluntarily and intentionally, and not because of mistake, accident or other innocent reason or motive.

Just before the court gave the above-quoted instructions on wilfulness, the court had said:

> Unless outweighed by evidence to the contrary, the law presumes that every person knows what the law forbids and what the law requires to be done. Therefore, the evidence that the Defendant acted or failed to act because of ignorance of the law does not constitute a defense.

These two instructions are inconsistent with the element of specific intent, which requires the government to prove that the defendant voluntarily and intentionally violated a known legal duty.

In a series of recent decisions this circuit has dealt with the problem of instructions on ignorance of the law in specific intent crimes. *U. S. v. Schilleci*, 545 F.2d 519 (CA5, 1977); *U. S. v. Granda*, 565 F.2d 922 (CA5, 1978); *U. S. v. Schnaiderman*, 568 F.2d 1208 (CA5, 1978); *U. S. v. Wellendorf*, 5 Cir., 574 F.2d 1289 (1978); *see U. S. v. Petersen*, 513 F.2d 1133 (CA9, 1975) (relied

---

**2.** Other offenses involving sawed-off shotguns may not require specific intent. Transportation in interstate or foreign commerce of a short-barreled shotgun is unlawful, 18 U.S.C. § 922(a)(4), and it is unlawful for any individual licensed to sell or deliver firearms to sell or deliver a short-barreled shotgun except as specifically authorized by the Secretary of the Treasury, 18 U.S.C. § 922(b)(4). Most likely these offenses would not require specific intent. *See U. S. v. Powell*, 513 F.2d 1249 (CA8), *cert. denied*, 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77 (1975); *U. S. v. Ruisi*, 460 F.2d 153 (CA2), *cert. denied*, 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972). Wilfulness is not an element of these offenses, and the items covered by the proscriptions are spelled out in the statute itself, not in administrative regulations.

on in *Schilleci*). Considered together, these cases require that the trial court, when instructing that specific intent is required, may not instruct that ignorance of the law is no excuse, because ignorance of the law goes to the heart of the defendant's denial of specific intent. *Schilleci*, 545 F.2d at 524.

Our cases are not one hundred percent consistent. *Schilleci* dealt with a conspiracy-to-wiretap charge. The trial court properly instructed the jury on specific intent but also instructed:

> It is not necessary for the prosecution to prove that the defendant knew that a particular act or failure to act is a violation of law. The presumption is that every person knows what the law forbids, and what the law requires to be done.

The defendant had requested a charge indicating that evidence of ignorance of the law is relevant to whether or not the defendant acted with specific intent.[3] We held that the trial court's instructions were erroneous. As a result of the instructions, "the jury never had the opportunity to consider the effect of lack of knowledge on the requisite specific intent." 545 F.2d at 524.

*Granda* dealt with a charge that defendant failed to report that she was transporting into the country over $5,000, an offense we held to require specific intent. The trial court did not instruct the jury at all on specific intent. We said, "[T]he proper instruction would include some discussion of the defendant's ignorance of the law since the defendant's alleged ignorance of the reporting requirement goes to the heart of his or her denial of the specific intent necessary to commit the crime." 565 F.2d at 926. *Schnaiderman* dealt with the same reporting requirements as *Granda*. We reiterated the responsibility of the trial court to discuss in the instructions the effect of de-

fendant's ignorance of the law. 568 F.2d at 1211 n. 8.

*Wellendorf* dealt with a charge of filing false federal income tax withholding forms. The trial court properly instructed that specific intent was required. We said that the court's failure to instruct that ignorance of the law may be considered was not erroneous. We distinguished *Schilleci* on the ground that the judge in *Schilleci* had given an instruction that it is presumed everyone knows the law. 574 F.2d at p. 1290. *Wellendorf* referred only to *Schilleci* and did not consider the later cases, *Granda* and *Schnaiderman*. We need not resolve the possible conflict between *Wellendorf* and *Granda*, because in this case, as in *Schilleci*, the court gave an instruction covering the presumption that everyone knows the law. The court's failure to discuss the relevance of ignorance of the law brings this case squarely within *Schilleci*, *Granda*, and *Schnaiderman*.

### C. The district court's refusal of requested instruction.

 Neither Davis nor Hill objected to the court's erroneous instruction. *See* Fed. R.Crim.P. 30. But insistence on an objection would be a pointless formality in this case. Hill had requested in writing a charge that specific intent was required. The court conducted a charge conference at which the question of specific intent was thoroughly aired. The trial judge discussed at length his conclusion that one who exports a shotgun has a duty to ascertain whether it is a legal gun (i. e., with barrel over 18 inches) or an illegal gun (with barrel under 18 inches). He analogized the case to a duck hunter's shooting a duck thinking it is a species that can be killed

---

**3.** "It is not necessary for the prosecution to prove that the defendant knew that a particular act or failure to act is a violation of law. *Unless and until outweighed by evidence in the case to the contrary,* the presumption is that every person knows what the law forbids, and what the law requires to be done. [*However, evidence that the accused acted or*

*failed to act because of ignorance of the law, is to be considered by the jury in determining whether or not the accused acted or failed to act with specific intent, as charged.*]"

Devitt & Blackmar, Federal Jury Practice and Instructions § 14.10 (in original, emphasis added).

legally and finding that instead he has shot a protected duck. He ended up by saying this:

> Now, the defendant has offered evidence that he did not know that his conduct was unlawful. On the contrary, the law presumes that every person knows what the law forbids and what the law requires to be done in light of the illustrations I have given you. Therefore, the evidence that the defendant acted or failed to act because of ignorance of the law does not constitute a defense, which in this particular kind of offense, gentlemen, and I'm talking about the gun charges, now specific intent as such is not an essential element.

Counsel for Hill excepted and counsel for Blackwell was permitted to adopt Hill's request and exception. Thus, with respect to both defendants, in these circumstances every function of the written request procedure, and of objections to the charge as given before the jury retired, were met. Whether this was a specific intent crime was squarely raised, fully discussed, and the court's position clearly and forcefully made and recorded. The position of court and of defendants was clear to each other. Counsel for both defendants, advised of an erroneous concept of the law, were unable to make closing arguments on lack of specific intent. *See U. S. v. Mendoza,* 473 F.2d 697 (CA5, 1974).[4] The procedure for requesting charges, and for objections, "should not be employed woodenly, but should be applied where its application will serve the ends for which it was designed. If it be applied blindly and without the benefit of analysis of particular fact situations before individual courts in specific cases it will be transformed from a sound principle of judicial administration into a trap for the unwary, a trap reminiscent of the senseless technicalities that characterized common law procedural systems and which made them a source of scorn and anger to many lawyers

and to most laymen." *U. S. v. Currens,* 290 F.2d 751, 759 (CA3, 1961).

III. Sufficiency of the evidence under the conspiracy to export count.

There was ample evidence that Davis knew that Hill intended to use a sawed-off shotgun. But only a sawed-off shotgun with a barrel less than 18 inches long is proscribed by the Munitions List, and it is much less clear that Davis ever knew that Fielden had shortened the barrel to under 18 inches. The undisputed evidence was that Davis never saw the gun. Fielden testified that in his first meeting with Davis, he told Davis that he was going to use a shotgun but he did not recall telling Davis what type of shotgun. Fielden testified that at a later meeting he told Davis he was going to use a "12 gauge sawed off shotgun with a sawed off pistol grip," and Davis "thought that that would work." On cross-examination Fielden said that when he told Davis he had cut the shotgun down in size he indicated the length of the gun with his hands. In his testimony Fielden did not communicate to the jury in any manner the length he had indicated to Davis through his hand gesture—he neither recreated the gesture for the jury nor orally described the distance indicated by the gesture.

■■ This failure was not, however, reversible error. Davis moved for a judgment of acquittal at the close of the government's case but did not renew the motion after presenting his defense. *See* Fed.R. Crim.P. 29; *U. S. v. Perez,* 526 F.2d 859, 863–64 (CA5), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976); Wright, Federal Practice & Procedure: Criminal § 463, 246–47. There is no manifest miscarriage of justice here requiring reversal; *see e. g., Fitzpatrick v. U. S.,* 410 F.2d 513 (CA5, 1969). Had the alleged insufficiency of the evidence been specifically pointed out to the court by a motion made at the close

---

4. The purpose of the Rule 30 requirement that counsel be informed of the court's proposed action on requested charges before arguments to the jury is that counsel, fairly advised, may intelligibly argue.

of the evidence the court could have permitted the government to reopen and put Fielden back on the stand to testify concerning what, if anything, he communicated to Davis about barrel length. Indeed one of the salutary purposes of the motion for judgment of acquittal is to give the court the opportunity to correct error at the time and on the spot.

### IV. Pretrial publicity—Hill.

The district court recognized that the jailbreak and ensuing indictments were the subject of extensive publicity. Addressing the jury panel as a group, the court admonished them to make their determination strictly from the evidence presented in court. Because the court determined that every panel member had "heard about this case," the court asked that any panel member raise his hand if he felt the publicity impaired his ability to render an impartial decision. None responded.[5] The court denied Hill's request to examine each panel member individually regarding the opinions held because of the publicity. Hill had previously placed much of the publicity in the record and had filed a motion requesting an individual examination of every panel member exposed to publicity to determine the extent, frequency, and harmfulness of the exposure.

This case attracted some national coverage and extensive local coverage by news media. Hill's motion brought to the court's attention the scope and substance of much of the local news coverage. Each juror had been exposed to some of this publicity. Prejudice was possible because of the backgrounds of Hill and his confederates[6] and the sensational nature of some of the reports. These reports capitalized on the violence of the armed raid, its purpose to free drug users, and its international repercussions.

■ The district court erred in not undertaking a more thorough examination of those panel members exposed to publicity. Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough. The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed. The ABA Standards Relating to Fair Trial and Free Press[7] recommend that the district court examine each juror individually and out of the presence of other jurors to determine what he heard or read and how it has affected his attitudes towards the trial. Though separate examination of jurors is sometimes

---

5. *The Court:*

"Now, all of you have had some exposure in the media to this case. To what extent have you been exposed to this publicity, this exposure by the media? Has such publicity affected your ability to render a fair and impartial verdict in this case and has there been any effect on your ability to listen to the evidence and base a verdict solely on the evidence? And if there has been any impairment or if you have reached any preconceived feeling or notion about what happened or any circumstances about this that would tend to cause you to favor one side or the other in this case, please raise your hand at this time. I take it that by your silence none of you feel that you would be prejudiced against the defendant and for the Government and vice versa. All right."

6. Of the accounts Hill placed in the record, at least one mentions Hill's previous arrests and convictions and his drug usage. Some accounts detail the backgrounds of Fielden and Davis, including Davis's conviction for criminal fraud.

7. "Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have."

§ 3.4(a) (Approved Draft, 1968).

preferable,[8] it is not necessarily required.[9] We recognize the district court's need for flexibility in interrogating jurors as to possible prejudice.

A fundamental principle of due process requires that the jury's verdict be based on evidence received in open court, not from outside sources. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). A juror's impartiality is not necessarily destroyed when he is exposed to pretrial publicity. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1643, 6 L.Ed.2d at 756; *see Calley v. Callaway,* 519 F.2d 184, 205–06 (CA5, 1975) (en banc), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). But when a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine whether the juror can lay aside any impression or opinion due to the exposure. The juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination.

An acceptable procedure is described in *U. S. v. Hyde,* 448 F.2d 815 (CA5, 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), which dealt with public-ity during the course of trial. Even though we held that the publicity was not prejudicial, we were critical of the trial court's asking the jury as a whole if anyone was exposed to publicity that would prevent him from impartially deciding the case. We said:

> [T]his Circuit has determined that it is for the court, not the jurors themselves, to determine whether their impartiality has been destroyed by any prejudicial publicity they have been exposed to. Therefore, when there has been publicity that would possibly prejudice the defendant's case if it reached the jurors, the court should first ask the jurors what information they have received. Then it should ask about the prejudicial effect and it should make an independent determination whether the juror's impartiality was destroyed.

448 F.2d at 848 n.38. Similarly, in *U. S. v. Williams,* 568 F.2d 464, 471 (CA5, 1978), also involving publicity during trial, we regarded as insufficient the jurors' assurances that each could render an impartial verdict.[10] In *Calley v. Callaway,* 519 F.2d at 208–09, we found credible the statements of the court members (jurors) that they would reach a verdict unimpressed by the extensive pretrial publicity in that case in large part because these statements were the product of a voir dire examination conducted according to the recommendations of the

**8.** In *U. S. v. Spinella,* 506 F.2d 426 (CA5), *cert. denied,* 423 U.S. 917, 96 S.Ct. 227, 46 L.Ed.2d 147 (1975), two jurors received harassing phone calls. In this situation, where the potential prejudice is analogous to pretrial publicity, we said that "the trial court had a duty to inquire into the character of the potentially prejudicial material to which the jury had been exposed, and its effect upon the jury's ability to render an impartial verdict." 506 F.2d at 428. We cited the ABA Standards as showing one way the trial court could carry out its duty of inquiry. In *Calley v. Callaway,* 519 F.2d 184, 208–09 (CA5, 1975) (en banc), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976), where the possibility of prejudice due to pretrial publicity was great, we applauded the trial court's voir dire examination, which conformed to the ABA Standards.

**9.** In *U. S. v. Schrimsher,* 493 F.2d 848 (CA5, 1974), however, where the trial court had ques-tioned separately each juror who read a particular article but did so in the presence of other jurors, we emphasized, "The safer practice in situations involving possible prejudice from newspaper articles or other sources is to interrogate each juror separately and out of the presence of the other jurors." 493 F.2d at 854.

**10.** The *Williams* opinion elsewhere cautions that pretrial publicity and publicity during trial cases are not in all respects similar and notes in particular the greater opportunities for prejudice from publicity during trial. 568 F.2d at 468. All the same, the responsibility of the court to determine for itself whether a juror can render an impartial verdict is not different for the two types of cases. *U. S. v. Williams* recognized as much by citing both types of cases to support its conclusion on this point. *See* 568 F.2d at 471 n.16, *citing U. S. v. Williams,* 523 F.2d 1203, 1209 n.10 (CA5, 1975).

ABA Standards.[11] The trial court, in what we called a "searching and sensitively conducted voir dire," examined each court member out of the presence of other court members and sought to determine the court member's exposure to publicity and its impact on his impartiality. The trial judge was able to conclude that a fair and impartial jury had been empaneled, and his conclusion was based on a particularized knowledge of the nature and extent of each juror's exposure to pretrial publicity.

■ Without establishing an inflexible rule we hold that under the circumstances of this case the district court did not make sufficient inquiry into the possibility of prejudice and did not reach its own independent determination whether the impartiality of any juror had been destroyed. This conclusion requires reversal of the conviction of Hill under both counts.

### V. Sentencing.

In sentencing Hill the district court indicated its belief that a jail guard had been beaten with a pistol during the jailbreak, a fact that is not found in the pre-sentence report or in the record. Hill argues that the court erred in declining to articulate the reasons for the sentence it imposed. He maintained that in sentencing him the court relied on its belief that a jail guard had been injured. He claims that the court could not rely on this data unless it was disclosed in the pre-sentence report so that he would have had an opportunity to challenge its accuracy. See Fed.R.Crim.P. 32. It is unnecessary to reach this issue since we reverse Hill's conviction. We assume that if there is a new trial and Hill is again convicted, the problem will not arise again.

The convictions of both appellants are REVERSED.

CHARLES CLARK, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts II and IV of Judge Godbold's opinion for the majority but respectfully dissent from Part III.

Given that it was essential for the proof to establish Davis knew that the sawed-off shotgun had a barrel less than 18″ long, and that this element of the crime of conspiracy be proven beyond a reasonable doubt, I believe our prior precedent mandates the vacation and dismissal of the conspiracy charge against Davis. Unlike 18 U.S.C. § 921(6), which defines an offending shotgun by barrel length (18″) *and* by overall length (26″), the regulation involved here only affects guns with barrel lengths of less than 18″, 22 C.F.R. § 121.04. The only possible knowledge Davis could have had that would indicate the size of the weapon was a description of overall length. Thus, under the most stringent appellate review, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there simply was no proof of the essential element of knowing conduct on Davis' part.

The majority invoke a waiver bar to this contention on appeal because Davis did not renew his motion for a judgment of acquittal at the close of all of the evidence, and because they discern no miscarriage of justice if the verdict were allowed to stand. This is where we part ways. The trial below was conducted on the erroneous premise (discussed in Part II of the majority opinion) that Davis would be guilty of conspiracy even if he did not know the barrel length of the gun Fielden planned to use.

This wrong premise accounts for the trial courts' action in overruling Davis' motion for judgment of acquittal at the close of the government's case. No additional evidence concerning barrel length or Davis' knowledge of the gun's dimensions was offered in the defendants' case. The court was in error when it overruled the motion Davis made when the government closed its proof. If it had wished to reopen and put on additional proof this motion gave ample notice of the contention Davis would make.

*Fitzpatrick,* relied on by the majority, found it to be a miscarriage of justice to

---

11. The other factor that made the statements credible was the long period of time between

the peak of publicity and the beginning of the trial.

allow a conviction to stand on the basis of a record which failed to prove an essential element of the Dyer Act violation charged. I would follow the same course here. The precedent of our circuit supports this course.

On the surface our cases in this area talk in terms of the court-created waiver doctrine,[1] but they do not follow its logic. A close look reveals that the standard applied when reviewing a procedurally proper appeal and that applied in determining the threat of a "manifest miscarriage of justice" are indistinguishable. In cases in which this court has found no "manifest miscarriage of justice," the court has nevertheless reviewed the facts and found the evidence sufficient. *United States v. Juarez*, 566 F.2d 511 (5th Cir. 1978); *United States v. Perez*, 526 F.2d 859 (5th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976); *United States v. Jones*, 486 F.2d 1081 (5th Cir. 1973); *United States v. Andrews*, 431 F.2d 952 (5th Cir. 1970). Similarly, where the court has found a "manifest miscarriage of justice" and reversed convictions for lack of sufficient evidence, despite the absence of a final motion for acquittal, the reasoning has paralleled that for finding a lack of sufficient evidence at the trial level. *See e. g., United States v. Casey*, 540 F.2d 811 (5th Cir. 1976), and *Fitzpatrick v. United States, supra.*

Given all of the factors present in this record: failure of proof of an essential element of the crime charged, a motion for judgment of acquittal based on such insufficiency at the close of the government's case, and a failure to reopen or to offer additional proof because both the govern-

ment and the trial court were proceeding on an erroneous premise of law, I would have no hesitancy in finding a manifest miscarriage of justice that would bar Davis' retrial. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

---

1. Fed.R.Crim.P. 29(a) states in part:
 The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information *after the evidence on either side is closed* if the evidence is insufficient to sustain a conviction of such offense or offenses.
 (emphasis added).
 The waiver doctrine originated as a means of measuring the quantum of evidence which would be reviewed by the appellate court. Application of the doctrine permitted the court to review the sufficiency of all the evidence

presented at trial, not merely that included within the government's presentation. *See* 8A Moore's Federal Practice ¶ 29.05. In application it expanded to require a renewed motion to preserve the issue of sufficiency of the evidence on appeal. However, in practice it has never actually prevented the appellate court from reviewing the evidence presented to the trier of fact.

