UNITED STATES of America, Plaintiff-Appellee,

v.

William COLACURCIO, Jr., a/k/a Rick Colacurcio, Dinos Rallis, a/k/a Kanavaros Panayotis, and Theodoros G. DiMopoulas, a/k/a Teddy, Defendants-Appellants.

No. 80–3063.

United States Court of Appeals, Fifth Circuit.*

Unit A

Oct. 22, 1981.

Rehearings Denied Dec. 3, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

* Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. Judge Reavley was recused and did not participate in the consideration of the petition for rehearing. This action is being taken by a quorum. 28 U.S.C. § 46(d).

F. Irvin Dymond, New Orleans, La., for Colacurcio.

Edward M. Baldwin, New Orleans, La., for Rallis.

Dwight M. Doskey, New Orleans, La. (Court-Appointed), for DiMopoulas.

Richard T. Simmons, Jr., Robert J. Boitmann, Asst. U.S. Attys., New Orleans, La., Mervyn Hamburg, Peter D. Isakoff, Crim. Div., Appellate Section, U. S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before THORNBERRY, REAVLEY and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Appellants William Colacurcio, Jr., Dinos Rallis, and Theodoros G. DiMopoulas were involved in a gambling operation in the French Quarter in New Orleans. To avoid arrest, they bribed several police officers, all of whom were undercover agents posing as corrupt policemen. Appellants were indicted for conspiring to violate the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), for committing a substantive RICO violation, 18 U.S.C. § 1962(c), and for conducting an illegal gambling operation in violation of 18 U.S.C. § 1955. The jury returned verdicts of guilty on all counts except for DiMopoulas' conspiracy charge. Finding no merit in any assignment of error, we affirm.

### Facts

In September 1978, the Federal Bureau of Investigation and New Orleans Police Department jointly undertook an investigation of criminal activities in the French Quarter. Three New Orleans policemen and one FBI agent, posing as corrupt police officers, made themselves available for "payoffs." Using this cover, they penetrated appellants' illegal gambling enterprise. The material highlights of the evidence introduced at trial, which consisted largely of the testimony of the undercover officers and tape-recorded conversations between the officers and defendants, reflect the following scenario.

On December 27, 1978, the undercover officers met with Colacurcio's son, Billy, who suggested the possibility of payoffs for "protection." A week later the officers met with Colacurcio and Billy and discussed a "package" deal, which included protection for proposed illegal gambling and prostitution operations, and other services such as help inside the prosecutor's office in the event of an unfortuitous arrest. On January 4, 1979, the officers again met with Colacurcio and were introduced to Rallis, who was to operate the gambling. Rallis was aware of the protection negotiations. A few days later the officers, Colacurcio and Rallis examined a site on Iberville

Street for the proposed gambling casino. Rallis signed a lease on the Iberville Street property, and the second floor was renovated and equipped for gambling. At other meetings during this time, Colacurcio, Rallis and the officers discussed, among other things, the prospects of the gambling venture, Rallis' qualifications to run the casino, the obligations of the officers under the arrangement, and the compensation the officers would receive for their efforts.[1]

The casino began operation with a card game during the early morning hours of January 20, 1979. The officers were present. Rallis collected money for the chips; DiMopoulas distributed them. Rallis took three percent of the chips from each pot and placed them in a cigar box; DiMopoulas periodically emptied this cigar box into a drawer. Two other persons, Demetra Ann Pierce and Vassilios Metrakos, served sandwiches and drinks to the players. Pierce and Metrakos also acted as security guards by looking through a peephole in the casino's door and observing people exiting the elevator. If they were recognized, Pierce or Metrakos would admit them to the casino.

The officers returned to the casino that evening and found the operations essentially unchanged. Pierce and Metrakos waited on the patrons, including the officers, and cleaned up the premises. A week later, one of the officers returned and observed a dice game and a card game; Rallis, DiMopoulas, Pierce, and Metrakos were performing the same roles as before.

After the first ten days of operation, Colacurcio expressed satisfaction with the officers' services and paid them $300. During the months of February, March, and April, Colacurcio paid the officers $300 in cash each week. Colacurcio insisted that all payments be made by him to the same officer so that if a "problem" developed the matter would involve one man's word against another.

On March 3, 1979, the officers observed a card game similar to those previously observed. During the game Rallis gave Di-

---

1. The officers were informed that they had a stake in the successful operation of the casino because their protection payoffs would increase as business improved.

Mopoulas fifty dollars. DiMopoulas motioned one of the officers to the side, surreptitiously passed the $50 to him through a handshake, winked, and said "That's from Dinos."

In late March, the officers met Rallis at the casino and were introduced to a man named Al who was to run a dice game on the third floor. Rallis told the officers that he and Colacurcio would take a percentage of Al's profits and that Colacurcio would pay for protection of that operation as well. Several days later the officers observed this dice game.

### Assignments of Error

Appellants raise a number of issues, contending: (1) we should reconsider our decision in *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); (2) the evidence is insufficient to sustain their convictions; (3) the trial judge erred in refusing to conduct individual voir dire examination of the jurors; and (4) the trial judge erred in refusing to instruct the jury on the defense of duress.[2]

#### 1. Reconsideration of Elliott

■ Appellants urge us to overrule our decision in *United States v. Elliott*, wherein we held that an association to commit illegal activities was an enterprise within the intendment of the RICO statute. This suggestion is rejected for two reasons. First, a panel of this court may not overrule a decision by a prior panel. The overruling of a previous decision is a prerogative reserved to the court sitting en banc. Second, appel-

lants base their argument on *United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980), in which the First Circuit reached the opposite conclusion from that reached by us in *Elliott*. The Supreme Court has resolved the variance by reversing *United States v. Turkette*, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and deciding the question in a manner consistent with our *Elliott* decision.

#### 2. Sufficiency of the Evidence

Appellants contend that the government did not offer sufficient evidence to convict them of gambling and, therefore, the two predicate offenses required to sustain a RICO conviction were not established. Appellants' argument is based on two premises: (1) the government failed to demonstrate that five or more persons conducted the gambling operation, a necessary requirement of the federal gambling statute, and (2) the several instances of bribery constitute only one offense.

#### The Five-Person Element

A conviction under the federal gambling statute requires proof that the gambling operation violates state or local law, "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business," and "has been or remains in substantially continuous operation for a period in excess of thirty days . . . ." 18 U.S.C. § 1955(b)(1). Appellants' operation commenced on January 20, 1979, and continued until at least March 3, 1979,

---

**2.** Appellants also raise assorted objections to several of the trial court's evidentiary rulings. Colacurcio argues that it was error for the trial court to admit a tape-recorded conversation in which he referred to a police-protected gambling establishment "we had" in Seattle. He also complains that the court erred in refusing to permit a defense witness to testify regarding hearsay statements about a pay-off scheme made to her by one of the officers. Rallis lists several instances in which he claims the trial judge erred by admitting prejudicial evidence, consisting of statements by Colacurcio that Rallis had a successful gambling operation "up north," Rallis' own statement, testified to by one of the officers, that Rallis had previously

been robbed, a statement by an officer that Rallis pulled a gun on a card player in another nightclub, and a joke by DiMopoulas that Rallis had been a pimp. Rallis also contends that prejudicial error was committed when certain taperecorded material, excluded from evidence, was mistakenly included on a transcript given to the jury. In addition, Rallis complains that his right of cross-examination was impermissibly curtailed.

We find no merit in any of these allegations of error. If error was committed in any of these rulings, considering the evidence against appellant, such error was harmless beyond a reasonable doubt.

thus satisfying the 30-day requirement. There is also no question that appellants violated state law. Appellants maintain, however, that the government failed to satisfy the five-person requirement.

They concede that the three of them may be counted towards the requirement, but argue that Pierce and Metrakos may not be. They reason that neither Pierce nor Metrakos "conducted" the gambling; they merely served food and drinks. Additionally, appellants argue that Metrakos should not be counted because he was a patron of the casino.

Appellants' argument must yield to our recent decision in *United States v. Tucker*, 638 F.2d 1292 (5th Cir. 1981). In *Tucker*, we held that waitresses who served drinks to gamblers, made change for them, and delivered messages could be counted in the five-member tally. We reasoned that such persons participated in the "conduct" of the gambling enterprise because they performed functions necessary or helpful to its operation. This interpretation of the gambling statute is consistent with the intent of Congress "to include all those who participate in the operation of a gambling business, regardless [of] how minor the roles," *United States v. Joseph*, 519 F.2d 1068, 1071 (5th Cir.), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1975), and is supported by the Supreme Court's statement in *Sanabria v. United States*, 437 U.S. 54, 70–71 n.26, 98 S.Ct. 2170, 2182 n.26, 57 L.Ed.2d 43 (1978), that section 1955 "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor."

■ Applying this standard to the present case, and mindful that we must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we conclude that Pierce and Metrakos performed functions necessary or helpful to the gambling operation. Both served food and drinks to the gamblers, the same function performed by the waitresses in *Tucker*. They also cleaned up and acted as security guards. Both contributed to the conduct of the gambling operation at least from January 20 to March 3, 1979,[3] and, therefore, both may be counted as part of the five-person element.

■ We also reject appellants' contention that Metrakos may not be counted because he gambled in the casino. We agree that a person who merely gambles may not be included in the necessary five. However, a person's participation in the conduct of a gambling enterprise is not altered by the fact that he gambles there as well. To rule otherwise would be to invite a subterfuge which would undermine the statute and frustrate the will of Congress: it would be a simple expedient to have every person, who might be counted, gamble at some point each day. We decline the invitation to scuttle section 1955 in that manner. One who is involved in the operation of a gambling enterprise may not shield the enterprise from federal prosecution by periodically participating as a player. Persons occupying such a dual status may be counted in satisfying the numerical requirement.

### Bribery

Two predicate offenses are necessary to support a RICO conviction. Colacurcio and Rallis contend that the several acts of bribery constitute only one offense. DiMopoulas argues that he did not participate in any acts of bribery so his substantive RICO conviction should be reversed.

In light of our resolution of the gambling issue, we need not consider in depth whether the bribes in this case constitute one or multiple offenses.[4] As to Colacurcio and

---

3. As in *Tucker*, we do not have to decide the outer limits of the "necessary-or-helpful" doctrine. All we decide today is that the activities of Pierce and Metrakos were sufficiently related to the operations of the gambling enterprise to come within the broad scope of section 1955.

4. We consider each of the bribes in this case to be a separate offense. *See United States v. Anderson*, 509 F.2d 312 (D.C.Cir.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). *Accord, United States v. Billingslea*, 603 F.2d 515 (5th Cir. 1979) (each act of embezzlement is a separate offense); *State v.*

Rallis, the two predicate crimes were established.

■ DiMopoulas argues that the only evidence of his participation in a bribe was the transfer of money from Rallis to one of the officers on the third of March. DiMopoulas maintains that this is insufficient to prove his involvement in bribery. We disagree. DiMopoulas motioned for the officer to join him away from others, he used a handshake motion to transfer the money to the officer's hand, he winked, and he said "That's from Dinos." These facts, together with DiMopoulas' knowledge of the gambling enterprise and his knowledge that the officer was one of those on the "take," are sufficient to support the conclusion that DiMopoulas participated in a bribe.

### 3. *Voir Dire*

■ Appellants argue that the trial judge erred by not conducting individual voir dire examination of the jurors to determine whether they had been prejudiced by pre-trial publicity. Rule 24(a) of the Federal Rules of Criminal Procedure vests the trial court with broad discretion to determine the scope and method of voir dire. This discretion includes the decision whether jurors should be questioned collectively or individually. *United States v. Delval*, 600 F.2d 1098 (5th Cir. 1979). In all cases, however, the court's discretion must be exercised with due regard for a defendant's right to trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ In *United States v. Davis*, 583 F.2d 190 (5th Cir. 1978), we examined the dimensions of voir dire when jurors have been exposed to potentially prejudicial pretrial publicity. We held that a trial judge had a duty to independently assess the impartiality of the jurors and outlined a three-step process for making this determination. The judge should: (1) ask what information the prospective jurors have received, (2) inquire into the prejudicial effect of the informa-

tion, and (3) make an independent determination whether the information tainted the person's impartiality. *Id.* at 197. We also stated that individual voir dire examination, out of the presence of the other members of the venire, is generally preferred but not always required. In *United States v. Gerald*, 624 F.2d 1291, 1298 (5th Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), we qualified our *Davis* ruling:

> The time-consuming, probing, preferably individual voir dire described in *Davis* generally is not required in cases involving unsupported general allegations of prejudicial pretrial publicity or in cases where the publicity does not create a significant potential of prejudice.

Appellants complain principally of two newspaper articles, one on May 27, 1979 and the other on June 2, 1979. The record contains excerpts from these articles. The May 27 article, which appeared on the front page of the New Orleans Times-Picayune, began: "A mystery man who law enforcement officers believe to have strong underworld connections across the United States is now operating several of the sleaziest nude dancing joints and massage parlors on Bourbon Street." The June 2 article was entitled "Vice Kingpin Quickly Posts Bail," and the continuation of the article on page 10 was entitled "Vice Lord Posts Bail In Less Than Half An Hour." Appellants also complain, without citing specific instances, of "numerous other articles about Mr. Colacurcio which also taint him in the darkest light," and link him to some prostitution cases stemming from the same police undercover operation that resulted in appellants' arrests.

■ Although these instances constitute more than mere "unsupported general allegations of prejudicial pretrial publicity," we are not persuaded that this publicity created such "a significant potential of prejudice" as to mandate separate voir dire of the jurors. We find no abuse of the trial judge's discretion in these instances.

*Ponthier*, 391 So.2d 1138 (La.1980) (several acts found to be one offense, but rationale of decision supports a finding of multiple offenses in the case at bar).

### 4. Duress Defense

Appellants contend that the trial court erred in refusing to instruct the jury on the defense of duress. Appellants reason that they were coerced by the police into offering bribes and that such economic coercion—sufficient to establish a case under the Hobbs Act, 18 U.S.C. § 1951—is a complete defense to the bribery charge.

This argument is unconvincing for three reasons. First, the Supreme Court held in *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), that the duress defense is not available "if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm.'" *Id.* at 410, 100 S.Ct. at 634 (*citing* W. LaFave & A. Scott, Handbook on Criminal Law 379 (1972)). In the present case there were legal alternatives available: the matter could have been reported to the Internal Affairs Division of the New Orleans Police Department,[5] to the district attorney, or to the United States attorney. Since appellants failed to pursue available reasonable alternatives, they may not successfully raise the duress defense.[6]

Further, appellants' insistence that extortion can be a defense to bribery is incorrect. *See United States v. McPartlin*, 595 F.2d 1321 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Therefore, even if the appellants were subjected to extortion, they can still be convicted on the bribery charge.

Finally, the record clearly demonstrates that the payoffs were not keyed to the termination of the alleged police harassment, but were solely to protect the gambling operation. The suggestion that appellants should not be convicted of bribery because they were forced by the police to make the payments in order to continue their illegal gambling business is devoid of merit. We find no error in the trial judge's refusal to instruct the jury on duress.

The convictions of all appellants are AFFIRMED.

---

5. Colacurcio contends that this approach would not be fruitful since on two prior occasions he filed such a complaint, received no satisfaction, and was sued by one of the policemen. But notwithstanding this previous experience, Colacurcio's lawyer recommended that he report his allegations of police harassment to the Internal Affairs Division rather than violate the law. Under these circumstances we are not convinced that this alternative was foreclosed.

6. Having thus decided this issue, we do not reach the question of whether the required coercion must be physical. We note that the Supreme Court has intimated, in regard to duress as a defense to a prosecution for prison escape, that physical coercion may be required. *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).